Roger L. COMEAU; David L. Comeau; Charles G. Comeau; Rooks County Savings Association; and Federal Savings and Loan Insurance Corporation (as successor in interest to Rooks County Savings Association); and Rupp Financial Corporation, Plaintiffs,

v.

Terry RUPP; C.F. Rupp; Farmers National Bank; Alexander Grant & Co., Defendants,

Grant Thornton (formerly Alexander Grant & Co., a partnership); and Fox & Company, a partnership, Defendants–Counterclaimants and Cross–Claimants.

Grant THORNTON and Fox & Company, Third Party Plaintiffs,

v.

Mimi KRUSE; Jack Curtis; George Ostmeyer; Bryan Ronck; and A.J. Schwartz, Third Party Defendants.

Civ. A. No. 86–1531–B.

United States District Court, D. Kansas.

Oct. 29, 1992.

---

**1136**

A.J. Schwartz, Donald E. Schrag, Ken M. Peterson, Morris, Laing, Evans, Brock & Kennedy, Chtd., Wichita, KS, for Roger L. Comeau, David L. Comeau, Charles G. Comeau, Rupp Financial Corp.

Byron J. Beck, Mary L. Barrier, Theresa L.F. Levings, Zoe Ann K. Holmes, Morrison & Hecker, Kansas City, MO, John C. Nettels, Jr., Morrison & Hecker, Wichita, KS, for F.D.I.C.

Robert F. Lytle, Patrick D. Gaston, Bennett, Lytle, Wetzler, Winn & Martin, Prairie Village, KS, for Terry Rupp, C.F. Rupp.

Robert J. Roth, William R. Smith, Hershberger, Patterson, Jones & Roth, Wichita, KS, Don C. Staab, Hays, KS, for Farmers Nat. Bank.

Ron C. Campbell, John T. Conlee, Fleeson, Gooing, Coulson & Kitch, Wichita, KS, Theodore A. Livingston, Jr., Mayer, Brown & Platt, Chicago, IL, for defendants Grant Thornton and Fox & Co.

Roger L. Bainbridge, Office of Thrift Supervision, Shawnee Mission, KS, James R. Bloss, Office of Thrift Supervision, Atlanta, GA, for Office of Thrift Supervision.

Robert C. Brown, Smith, Shay, Farmer & Wetta, Wichita, KS, for Jack Curtis, Bryan Ronck.

Jana D. Abbott, Ken M. Peterson, Morris, Laing, Evans, Brock & Kennedy, Chtd., Wichita, KS, for A.J. Schwartz.

## MEMORANDUM AND ORDER

BELOT, District Judge.

This matter is before the court on the various motions for summary judgment and/or dismissal. Several miscellaneous motions are also pending. The court has previously outlined the factual circumstances and procedural history of this litigation. *See* 762 F.Supp. 1434, 1437–38 (per Theis, J.), and will discuss additional facts as they relate to the respective motions. For convenience, the court provides an index of the pending matters.

| | | | Page |
|---|---|---|---|
| I. | Summary Judgment and/or Dismissal Motions | | 1137–1163 |
| | A. | FDIC v. Accountants | 1137–1146 |
| | | 1. Liability of FDIC for Acts of RCSA's Agents | 1138–1143 |
| | | 2. Causation Requirements for Auditor Malpractice | 1143–1144 |
| | | 3. Reckless and Wanton Conduct | 1144–1145 |
| | | 4. Statute of Limitations | 1145–1146 |
| | B. | Comeaus v. Accountants | 1146–1154 |
| | | 1. Section 10(b) and Rule 10b–5 | 1146–1151 |
| | | 2. Breach of Fiduciary Duty and Reckless Conduct | 1151–1152 |
| | | 3. Standing to Assert Claims Against Fox | 1152–1154 |
| | C. | Accountants v. A.J. Schwartz | 1154 |
| | D. | Comeaus v. Rupps | 1154–1161 |
| | | 1. Federal Securities Claims | 1154–1155 |
| | | a. § 10(b) of the Securities Act of 1934 | 1154 |
| | | b. § 12(2) of the Securities Act of 1933 | 1154 |
| | | 2. State Law Claims | 1155–1161 |
| | | a. Securities Claims | 1156–1160 |
| | | b. Common Law Claims | 1160 |
| | E. | FDIC v. Rupps | 1161–1162 |
| | F. | Accountants v. Rupps | 1161–1162 |
| | G. | Accountants v. Comeaus | 1162 |
| | H. | Accountants v. Bryan Ronck & Jack Curtis | 1162–1163 |
| II. | Motion for Order Approving Settlement | | 1163–1164 |
| III. | Accountants' Motion to Dismiss FDIC's Complaint and Other Sanctions | | 1165–1167 |
| IV. | Objections to Magistrate's Order | | 1167 |
| V. | Motion to Bifurcate | | 1167–1168 |
| VI. | Conclusion | | 1168 |

I. Summary Judgment and/or Dismissal Motions

Several parties have moved for summary judgment.

Rule 56(c) of the Federal Rules of Civil Procedure directs the entry of summary judgment in favor of the party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A principal purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The court's inquiry is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if there is sufficient evidence on which a trier of fact could reasonably find for the non-moving party. *Prenalta Corp. v. Colorado Interstate Gas Co.*, 944 F.2d 677, 684 (10th Cir.1991).

The burden of proof at the summary judgment stage is similar to that at trial. "Entry of summary judgment is mandated, after an adequate time for discovery and upon motion, against a party who 'fails to make a showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Aldrich Enters., Inc. v. United States*, 938 F.2d 1134, 1138 (10th Cir.1991) (quoting *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact by informing the court of the basis for its motion. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552. This burden, however, does not require the moving party to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* (emphasis in original). Once the moving party properly supports its motion, the nonmoving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514; *Devery Implement Co. v. J.I. Case Co.*, 944 F.2d 724, 726 (10th Cir. 1991). The court reviews the evidence in a light most favorable to the non-moving party, *e.g., Washington v. Board of Public Utilities*, 939 F.2d 901, 903 (10th Cir.1991), under the substantive law and the evidentiary burden applicable to the particular claim. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513.

A. *FDIC v. Accountants* (Doc. 821)

Defendants Grant Thornton ("Grant") and Fox & Company ("Fox") (collectively, "the Accountants") move for summary judgment on all claims filed against them by the Federal Deposit Insurance Corporation ("FDIC"). A brief recitation of the nature of these claims is in order.

The FDIC brings this action in its corporate capacity as the successor in interest to the Rooks County Savings and Loan Association ("RCSA" or "Association"). The FDIC has sued Terry and C.F. Rupp ("the Rupps"), who from May 1983 until February 1986 were majority owners, president, and directors of the RCSA. The minority owners and directors during this same time period were plaintiffs Roger, David, and Charles Comeau ("the Comeaus").[1] The FDIC alleges that the lending practices of the Rupps caused the RCSA to suffer losses on specific loans, for which the FDIC

---

1. From May 1983 until February 1986, the Rupps owned 70% of the stock of Rupp Financial Corporation ("RFC"), which was a holding company that owned 99.5% of the stock in the RCSA. The Comeaus owned 30% of RFC stock, until they acquired 100% of the stock in February 1986. C.F. Rupp and David Comeau were not directors during this entire period. At all times relevant to this suit, Terry Rupp was president and director of RCSA, and Charles and Roger Comeau were directors.

seeks recovery under a single theory of breach of fiduciary duty to the Association.

The FDIC also brings common law claims against the Accountants. The FDIC alleges that the Accountants negligently and recklessly certified RCSA's financial statements for the years 1984 and 1985 as conforming to Generally Accepted Accounting Principles ("GAAP"), notwithstanding the Accountants' actual or constructive knowledge of the high risk posed by certain participation loans. The specific loans for which the FDIC seeks recovery originated from the Halle Mortgage Company—a mortgage brokerage in Colorado Springs, Colorado that was involved in real estate acquisition and development in Colorado. The FDIC alleges that the Accountants failed to recognize the high risk nature of these loans, and that the losses suffered on these loans would have been avoided if the Accountants had properly alerted the Comeaus and George Ostmeyer—alleged "outside directors" of the RCSA Board.

The Accountants raise a series of interrelated legal arguments that will frame the scope of the court's factual review. According to the Accountants: (1) the Rupps' knowledge and concealment of material facts, which the FDIC itself alleges, must be imputed to the RCSA and the FDIC as its successor in interest; (2) the Rupps' misfeasance, imputed to the FDIC, is contributory negligence on the part of plaintiff FDIC, which bars the FDIC from recovery; (3) reliance on the 1984 and 1985 audits is an essential element of the FDIC's malpractice claim against the Accountants, and the FDIC cannot demonstrate such reliance.

As an initial matter, the court notes the parties' apparent agreement that it is appropriate to rely on Kansas law in addressing the claims of and defenses against the FDIC.[2] (FDIC Amended Response, Doc. 871, at 80; Accountants' Reply, Doc. 917, at 5 n. 1). The court has previously noted

that federal common law governs the rights and obligations of the FDIC in this action. 762 F.Supp. at 1439 n. 5. The primacy of federal common law over claims involving the FDIC–Corporation is expressly mandated by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, § 209, 103 Stat. 183, 216 (codified at 12 U.S.C. § 1819(b)(2)(A)), the jurisdictional provisions of which apply retroactively to pending cases. *In re Meyerland Co.*, 960 F.2d 512, 514 n. 2 (5th Cir.1992) (en banc; citing cases); *id.* at 522 n. 1 (Politz, J., dissenting; citing cases).[3] Nonetheless, the court may look to state law in fashioning federal common law. *Downriver Community Federal Credit Union v. Penn Square Bank*, 879 F.2d 754 at 761 (10th Cir.1989). Neither party asserts that Kansas law is incompatible with the need for a uniform federal rule. The court will therefore turn to Kansas law for guidance, bearing in mind that the common law claims of the FDIC arise under federal law.

### 1. Liability of FDIC for Acts of RCSA's Agents

■ Much of the Accountants' motion is premised on the argument that the wrongful actions of the Rupps, which the FDIC itself alleges, must be imputed to the FDIC.

In its previous order, the court noted that under traditional tort principles, the acts and omissions of the RCSA's officers and directors are imputable to the RCSA, and to the FDIC as its successor in interest. 762 F.Supp. at 1441. *See also City of Arkansas City v. Anderson*, 243 Kan. 627, 635, 762 P.2d 183, 189 (1988), *cert. denied*, 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989). The court further ruled that the decision of the Kansas Supreme Court in *FSLIC v. Huff*, 237 Kan. 873, 704 P.2d 372 (1985) did not alter the general rule that imputes the wrongful conduct of a corporation's officers to that corporation

---

**2.** Technically, the FDIC argues for application of federal common law, but appears to adopt Kansas law as consistent with the federal interests involved.

**3.** In any event, federal law also applied under the previous jurisdictional statute, 12 U.S.C. § 1730(k)(1), which was repealed by FIRREA. Pub.L. No. 101–73, tit. IV, § 407, 103 Stat. 363 (1989).

and its successors. 762 F.Supp. at 1441–43. The court also noted, however, that the parties had not addressed whether other considerations might alter the general rule. *Id.* at 1440 n. 6 (citing *Cenco, Inc. v. Seidman & Seidman*, 686 F.2d 449, 454–56 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982)); *see also* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 74, at 529 (5th ed. 1984) (for purposes of contributory negligence, "there may be special reasons of policy in particular cases which will lead to the imputation of [an agent's] negligence to a defendant, but not to a plaintiff").

The Accountants now contend that no other considerations should alter the court's earlier decision adhering to the general rule that imputes actions of a corporation's officers to that corporation.

In *Cenco, Inc. v. Seidman & Seidman*, 686 F.2d 449, 454–56 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982), which also involved allegations of auditor malpractice, the court addressed the circumstances under which the misconduct of corporate employees will be imputed to the corporation. In that case, former managers of the defendant corporation had engaged in a massive fraudulent scheme to inflate the corporation's inventories. The immediate effect of this fraud was to provide several benefits to the corporation, at the expense of outsiders such as creditors. *Id.* at 451. When the fraud was discovered, certain stockholders sued the corporation, which in turn sued the accounting firm that had audited the corporation and failed to discover the fraud. The auditors set up the defense of contributory negligence against the corporation's claims, alleging that the actions and knowledge of the corrupt former managers should be imputed to the corporation.

In interpreting Illinois law, the *Cenco* court prefaced its discussion with the assumption that two fundamental objectives of tort liability remained applicable: to compensate the victims of wrongdoing and to deter future wrongdoing. 686 F.2d at 455. The court noted that the stockholders would be the real beneficiaries of a judg-

ment in favor of the corporation, and that such a result would effectively allow the stockholders to benefit from the fraud. As to the goal of deterrence, the court found that allowing the corporation to shift liability to the accountant would reduce the shareholder's incentive to hire more honest managers and to monitor their behavior more closely. The court summarized the pertinent considerations:

Fraud on behalf of a corporation is not the same thing as fraud against it. Fraud against the corporation usually hurts just the corporation; the shareholders are the principal if not only victims; their equities vis-á-vis a careless or reckless auditor are therefore strong. But the stockholders of a corporation whose officers commit fraud for the benefit of the corporation are beneficiaries of the fraud. Maybe not net beneficiaries, after the fraud is unmasked and the corporation is sued—that is a question of damages, and is not before us. But the primary costs of a fraud on the corporation's behalf are borne not by the stockholders but by outsiders to the corporation, and the stockholders should not be allowed to escape all responsibility for such a fraud, as they are trying to do in this case.

686 F.2d at 456. Because the stockholders were the beneficiaries of the former managers' fraud, the court found no error in an instruction that allowed the jury to impute the fraud to the corporation. *Id.; cf. Schacht v. Brown*, 711 F.2d 1343, 1347–49 (7th Cir.) (conduct of former officers not attributable where fraud artificially prolonged corporation's existence past insolvency), *cert. denied*, 464 U.S. 1002, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983).

■ As stated in *Cenco*, the exception to the general rule of respondeat superior focuses on whether the misdeeds of the corporate employee worked to the benefit or detriment of the corporation. If the corporation's agent acted adversely to the interests of the corporation, the agent's acts are not imputed to the corporation. *See Supreme Petroleum, Inc. v. Briggs*, 199 Kan. 669, 675–74, 433 P.2d 373, 378 (1967) (agent's acts that are adverse to principal's

interest are not imputed to principal unless agent is sole representative of principal); *Ryan v. Scovill,* 140 Kan. 588, 590–91, 37 P.2d 1007 (1934); *First Nat'l Bank of Arkansas City v. Skinner,* 10 Kan.App. 517, 62 P. 705, syl. ¶ 1 (1900); *Greenstein, Logan & Co. v. Burgess Mktg., Inc.,* 744 S.W.2d 170, 190–91 (Tex.Ct.App.1987) (evidence tended to show that employee's fraud grievously harmed rather than benefitted corporation and fraud would not be imputed to corporation); *Adair State Bank v. American Casualty Co.,* 949 F.2d 1067, 1074 (10th Cir.1991) (court would not impute to corporation conduct that adversely affected it); *see generally* 3 *Fletcher Cyclopedia of the Law of Private Corporations* § 819 (perm. ed. 1986).

This exception was recognized by two recent circuit court decisions that have considered whether the conduct of former employees of a failed savings and loan may be imputed to the FDIC. In *FDIC v. Ernst & Young,* 967 F.2d 166 (5th Cir.1992), the FDIC sued the auditors of a savings and loan that had been owned and operated by a sole shareholder. The FDIC also sued the sole shareholder for his unsafe underwriting practices and fraudulent book entries. Significant to the court's decision was the FDIC's decision to prosecute the action only as an assignee of the savings and loan, and not on the FDIC's own behalf. For this reason, the court held that the FDIC assumed no greater rights than those of any other assignee of the association's assets. *Id.* at 169–70. Noting the exception to the general rule that imputes a bank director's knowledge to the bank, the court went on to hold that the sole shareholder had acted on the association's behalf because the owner had also served the association by serving his own interests. *Id.* at 171. Thus, the court held that the conduct of the shareholder was attributable to the FDIC, where "the FDIC, as assignee of a corporation with a dominating sole owner, sues an auditor for negligently performing an audit upon which nei-

ther the owner nor the corporation relied." *Id.* at 172.

A different result was reached by the Ninth Circuit in a case decided shortly before *Ernst & Young.* In *FDIC v. O'Melveny & Meyers,* 969 F.2d 744 (9th Cir.1992), the savings and loan association had become involved in the funding of two real estate projects, for which a law firm had been hired to assist in the preparation of two private placement memoranda. After the association went into receivership, the FDIC sued the law firm, alleging that the private placement memoranda were inaccurate and had misled the outside investors. The law firm defended with the argument that the fraud of the association's former officers[4] must be imputed to the FDIC. The court rejected this defense:

> Here, disaster, not benefit, accrued to [the association] through the malfeasance of [its officers]. *Schacht* [*v. Brown,* 711 F.2d 1343 (7th Cir.), *cert. denied,* 464 U.S. 1002, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983) ] and *[In re] Investors Funding* [*Corp.,* 523 F.Supp. 533 (S.D.N.Y.1980) ] elaborate that conduct aggravating a corporation's insolvency and fraudulently prolonging its life does not benefit that corporation. Indeed, under *Schacht,* even if the corporation were somehow to benefit from the wrongdoing of insiders, the insiders' conduct is still not attributable to the corporation if a recovery by the plaintiff would serve the objectives of tort liability by properly compensating the victims of the wrongdoing and deterring future wrongdoing.

*O'Melveny,* 969 F.2d at 750.

The *O'Melveny* court also rejected the argument that FDIC, as receiver of the association, assumed no greater rights than the association itself would have had. After noting that federal common law rather than state law determines the defenses available against the FDIC, the court explained:

> A receiver, like a bankruptcy trustee and unlike a normal successor in interest,

---

**4.** The opinion in *O'Melveny* does not clearly state whether the wrongdoing owners were the sole shareholders, but the opinion indicates that

they owned "nearly all of the corporation's stock." 969 F.2d at 750.

does not voluntarily step into the shoes of the bank; it is thrust into those shoes. It was neither a party to the original inequitable conduct nor is it in a position to take action prior to assuming the bank's assets to cure any associated defects or force the bank to pay for incurable defects. . . .

Also significant is the fact that the receiver becomes the bank's successor as part of an intricate regulatory scheme designed to protect the interests of third parties who also were not privy to the bank's inequitable conduct. That scheme would be frustrated by imputing the bank's inequitable conduct to the receiver, thereby diminishing the value of the asset pool held by the receiver and limiting the receiver's discretion in disposing of the assets.

In light of these considerations, we conclude that the equities between a party asserting an equitable defense and a bank are at such variance with the equities between the party and a receiver of the bank that equitable defenses good against the bank should not be available against the receiver. To hold otherwise would be to elevate form over substance—something courts sitting in equity traditionally will not do.

*O'Melveny*, 969 F.2d at 751–52 (citations omitted).

■ The court finds the analysis of *O'Melveny* persuasive and fully applicable to this case. *See also FDIC v. Clark*, 978 F.2d 1541, 1549 (10th Cir.1992) (relying on *O'Melveny* to prevent defendant attorneys from imputing conduct of former bank officers to FDIC). As the facts of this case demonstrate, it is questionable whether a savings and loan association can be said to benefit from slipshod bookkeeping, non-existent internal controls, and investment practices fraught with risk. This conduct may have personally benefitted the Rupps, who allegedly drove RCSA to the brink of insolvency before selling their overvalued shares to the Comeaus. But it has brought only financial ruin to the RCSA. In the court's view, it would present at least a question of fact whether the Rupps acted for personal gain or for the purpose, however misguided, of benefiting RCSA.[5] *See Cenco*, 686 F.2d at 456 (trial court properly allowed jury to attribute managers' fraud to corporation only if it found that managers had acted for benefit of corporation); *Greenstein*, 744 S.W.2d at 191.

■ Even assuming that the wrongful conduct of RCSA's former owners was undertaken to benefit RCSA, the court finds that the considerations of federal common law set forth in *O'Melveny* preclude attribution of this conduct to the FDIC. As had the court in *Cenco*, the *O'Melveny* court premised its analysis on the underlying objectives of tort liability: to compensate the victims of wrongdoing and to deter future misconduct. In *Cenco*, these objectives were well served by adherence to the rule that imputes wrongful conduct to the corporation-principal, because in that case the true beneficiaries of a verdict in favor of the corporation would be *the shareholders*. As *Cenco* explained, the shareholders, although innocent of any actual misconduct, should not be rewarded for a failure

---

5. Although the Accountants' position finds some support in *Ernst & Young*, that case presented facts significantly different from those before this court. Unlike the owner in *Ernst & Young*, the Rupps were not the sole shareholders of RCSA. The significance of this distinction was discussed in *Supreme Petroleum, Inc. v. Briggs*, 199 Kan. 669, 433 P.2d 373 (1967). In *Briggs*, the court recognized the exception to respondeat superior when the agent acts adversely to the principal's interest. *Id.* at 675, 433 P.2d at 378. However, the court relied upon an "exception to the exception," which nonetheless imputes the agent's wrongful acts to the principal when the agent is the sole actor or representative of the principal. *Id.* at 676, 433 P.2d at 378 (quoting 3 Am.Jur.2d *Agency* § 284, at 647). In such a case, the sole agent may properly be considered the alter ego of the principal. *Id.* Thus, because the agent in *Ernst & Young* was the association's sole owner, as well as its chairman; chief operating officer; and chief executive officer—among other positions—the agent so dominated the association that it was proper to consider his acts as the association's acts. 967 F.2d at 172 (expressly limiting holding to narrow facts of a "dominating sole owner"). By contrast, the Rupps owned only 70% of RCSA, and their involvement in RCSA, although considerable, does not lend itself as easily to the characterization of "dominating."

to hire honest managers and to monitor the corporate employees more carefully. 686 F.2d at 456.

A far different set of equities is present in this case, where the FDIC has acquired separate interests from those of the current holders of RCSA stock. First and foremost, the beneficiaries of a verdict for the FDIC will not be RCSA's stockholders. Rather, it will be the public, which had no voice in hiring or electing RCSA's officers and directors, nor even in becoming the assignee of certain of the RCSA's assets and liabilities.[6] Thus, the status of the FDIC in this case is more akin to that of a creditor, rather than a stockholder or a voluntary assignee of the association. If the court were to treat plaintiff-FDIC as a stockholder—which was appropriate in *Cenco*, or as simply another assignee—under the wooden approach of the court in *Ernst & Young*—then the public would be made to pay for wrongs that it was in no real position to prevent, and that have been visited upon it by the very persons who owe it a heightened fiduciary duty. *See* 762 F.Supp. at 1442; *FSLIC v. Huff*, 237 Kan. 873, 881, 704 P.2d 372 (1985) (officers and directors of savings and loans owe duty not only to corporation, but to public). Such a policy would defeat rather than further the tort principle of compensating the victim, while doing nothing either to deter culpable parties from refraining from tortious conduct, or to encourage the shareholders to employ more trustworthy corporate managers.

■ Nor does the court find any inequity in withdrawing from the Accountants' litigation arsenal a defense that would normally be available. The Accountants seek to impute the Rupps' conduct to the FDIC for two reasons: (1) to set up the defense of contributory negligence to their own negligence as alleged by the FDIC, and (2) to obtain indemnity from the FDIC in the event that they are found liable to the Comeaus.[7] *See* 762 F.Supp. at 1441. In either case, the relief sought by the Accountants would come into play only upon plaintiff's initial showing of some culpable conduct on the part of the Accountants. But by imputing to FDIC the torts of RCSA's officers, the Accountants would shift their liability for plaintiff's losses to the FDIC. Thus, this is not a case where a wholly innocent party will be called upon to pay for a loss caused by another. To the contrary, allowing the FDIC to disavow the wrongful acts of RCSA's former officers prevents *culpable* parties from transferring liability for their tortious conduct to an entity that is indisputably without fault in bringing about RCSA's losses: the public, in the person of the FDIC.

In any event, refusing to impute to the FDIC the conduct and knowledge of RCSA's managers does not lessen plaintiff's burden to prove that its losses were caused by the Accountants' wrongful conduct. In other words, the Accountants may still argue that the knowledge and actions of the Comeaus and/or Rupps, although not attributable to the RCSA, were the legal cause of plaintiff's losses, which could not have been prevented by more prudent accounting practices. *See infra* at 1143–1144.

For these reasons, the court concludes that the Accountants may not impute to the FDIC the knowledge or conduct of RCSA's officers, directors, and owners—

---

6. The Accountants distinguish *O'Melveny* by noting that the action in that case was brought by the FDIC in its receiver capacity. This is a distinction without significance. The FDIC-Corporation does not in any real sense "voluntarily" assume the assets and liabilities of the closed association. Congress has created a regulatory scheme that effectively thrusts upon the FDIC, in both its receiver and corporate capacity, those assets and liabilities of insolvent savings and loan associations that no assuming bank is willing to acquire voluntarily. *See FDIC v. Bank of Boulder*, 911 F.2d 1466, 1470 (10th Cir.1990) ("FDIC cannot avoid acting in two capacities in a P & A transaction"), *cert. denied*, —— U.S. ——, 111 S.Ct. 1103, 113 L.Ed.2d 213 (1991). To allow the case to turn upon this distinction "would be to elevate form over substance—something courts sitting in equity traditionally will not do." *O'Melveny*, 969 F.2d at 752.

7. This possibility is precluded, however, by the court's rulings with respect to the Comeaus' claims against the Accountants. *See infra* at 1146–1154.

either for the purpose of asserting the defense of contributory negligence against the FDIC's claims, or for the purpose of claiming indemnity from the FDIC.

### 2. Causation Requirements for Auditor Malpractice

■ The Accountants contend that the FDIC cannot demonstrate that their alleged negligence was the legal cause of RCSA's losses. According to the Accountants, reliance is an essential element of the FDIC's negligence claim, and the FDIC cannot show that the operatives at RCSA relied on the 1984 and 1985 audits.

■ The parties appear to be in agreement that plaintiff may establish legal causation under the "substantial factor" test. *See, e.g., Roberson v. Counselman,* 235 Kan. 1006, 1011, 686 P.2d 149 (1984); *Donnini v. Ouano,* 15 Kan.App.2d 517, 520, 810 P.2d 1163, 1166 (1991). A defendant's conduct is a substantial factor if it " 'has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility, rather than the so-called "philosophic sense," which includes every one of the great number of events without which any happening would not have occurred.' " *Roberson,* 235 Kan. at 1012, 686 P.2d 149 (quoting Restatement (Second) of Torts § 431 comment a (1965)). To be a substantial factor, however, the defendant's conduct need not be the only factor. *Id.* at 1016, 686 P.2d 149 (quoting *Jones v. Montefiore Hosp.,* 494 Pa. 410, 416, 431 A.2d 920 (1981)).

The Accountants do not attack these general principles of negligence law, but instead contend that in malpractice actions against accountants, the "substantial fac-

tor" test necessarily includes the element of reliance on the negligently prepared audit. *See FDIC v. Ernst & Young,* 967 F.2d 166, 170 (5th Cir.1992); *Smolen v. Deloitte, Haskins & Sells,* 921 F.2d 959, 964 (9th Cir.1990); *Drabkin v. Alexander Grant & Co.,* 905 F.2d 453, 455–57 (D.C.Cir.), *cert. denied,* 498 U.S. 999, 111 S.Ct. 559, 112 L.Ed.2d 566 (1990); *E.F. Hutton Mortgage Corp. v. Pappas,* 690 F.Supp. 1465, 1473–75 (D.Md.1988), *aff'd mem.,* 900 F.2d 255 (4th Cir.1990); *Bonhiver v. Graff,* 311 Minn. 111, 248 N.W.2d 291 (1976); Restatement (Second) of Torts § 552 (1979).

Regardless of whether the "but for" or "substantial factor" test of causation is to be applied, the court agrees that reliance is an essential element of the FDIC's burden of proof on causation. "Under the common-law theory of professional negligence in most jurisdictions, an accountant must have actual knowledge that a certain class of persons will *rely* on the accounting before the accountant can be found liable." *Gillespie v. Seymour,* 14 Kan.App.2d 563, 575, 796 P.2d 1060 (1990) (emphasis added). Thus, if the evidence allows the inference that a properly prepared audit would not have been relied upon in any event, an accountant's negligent performance cannot be said to be a cause of the financial loss.

■ The Accountants' argument is flawed, however, because it implicitly assumes that the *Rupps* were the only class of persons entitled to rely on the 1984 and 1985 audits. The Accountants make no attempt to profess ignorance of the reliance that the RCSA Board *as a whole* placed on their audits. David Comeau and George Ostmeyer—also members of the RCSA Board—have testified that they would have [8] taken corrective action if they

---

**8.** The court finds unavailing the Accountants' attempt to dismiss deposition testimony of the Comeaus and Ostmeyer as "self-serving" and "speculative." There is no per se rule against "self-serving" testimony. *See Churchman v. Pinkerton's Inc.,* 756 F.Supp. 515, 520 (D.Kan. 1991) (although self-serving, employer's testimony that it would have fired plaintiff if it had known of misrepresentations was evidence of what reasonable management would do under the circumstances); *see also Schmeck v. City of Shawnee,* 232 Kan. 11, 651 P.2d 585, syl. ¶ 12

(1982). The question, rather, is whether the testimony has probative value, Fed.R.Evid. 401, and whether its probative value is substantially outweighed by other considerations. *Id.* 403.

By urging the court to refuse consideration of this deposition testimony, the Accountants fail to recognize that plaintiff's proof of causation in this case is rendered more difficult by the very nature of the claims: negligent omissions on the part of defendants that in turn caused inaction on the part of the RCSA Board. Because this

had been informed of the serious problems with RCSA's lending practices. (D. Comeau Depo., 3/29–3/30/89, pp. 714, 844–45, 879; Ostmeyer Depo., pp. 13–17). In addition, the FDIC's accounting expert has testified that in his experience, an audit that advises an association of the need for a $500,000 loan loss reserve—which was not done in this case—can reasonably be expected to "get management's attention very quickly." (Dooley Depo., p. 142). Finally, the corrective steps actually taken by the RCSA Board when it did obtain additional information concerning the Halle loans—after the Comeaus assumed 100% ownership—undermines any claim that other members of the Board would not have used an adequate audit to prevent the loan losses. Viewing the evidence most favorably to the FDIC, there are genuine issues of fact as to whether the RCSA Board as a whole relied upon the audits, thus causing loan losses that would not otherwise have been sustained. *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 41, at 270 (5th ed. 1984) (causation may be inferred if a particular omission may be expected to produce a result, and that result has in fact followed).

### 3. Reckless and Wanton Conduct

The Accountants claim that they are entitled to summary judgment on the FDIC's claim that their conduct was reckless and wanton.

■ The parties appear to be in agreement as to the appropriate standard governing accountant liability for reckless and wanton conduct. In order to prove that an accountant has acted recklessly or wantonly, "the plaintiff must establish that the defendant lacked a genuine belief that the information disclosed was accurate and complete in all material respects." *Mc-*

*Lean v. Alexander*, 599 F.2d 1190, 1198 (3d Cir.1979) (citing *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931) & *O'Connor v. Ludlam*, 92 F.2d 50 (2d Cir.), *cert. denied*, 302 U.S. 758, 58 S.Ct. 364, 82 L.Ed. 586 (1937)). The Accountants contend that plaintiffs can make no such showing in this case, because there is no evidence that the Accountants knew that their financial statement opinions were wrong, nor that they intentionally and deliberately failed to conduct a GAAS audit. In essence, the Accountants argue that they must have had a specific intent to violate a known duty, or at least knowledge that they were in fact violating this duty.

■ The court rejects the Accountants' cramped view of the evidentiary support needed to establish reckless or wanton conduct. As the very word suggests, "reckless" conduct does not require evidence that the actor "intentionally and deliberately" failed to perform a duty. Rather, in the context of auditor malpractice actions, it is sufficient for the plaintiff to prove that the auditor lacked a *genuine* and *honest* belief in the truth of his report. *Seiffer v. Topsy's Int'l, Inc.*, 487 F.Supp. 653, 665 (D.Kan.1980). This may include the pretense of knowledge when there is none, or "'shoddy accounting practices amounting at best to a "pretend audit," or ... grounds supporting a representation "so flimsy as to lead to the conclusion that there was no genuine belief back of it"....'" *Id.; see also State Street Trust Co. v. Ernst*, 278 N.Y. 104, 15 N.E.2d 416, 419 (1938). Similarly, "[t]o constitute wantonness, the acts complained of must show not simply lack of due care, but that the actor *must be deemed* to have realized the imminence of injury to others from his acts and to have refrained from taking steps to

necessarily poses the causation question of what "would have" happened if the Accountants had adequately fulfilled their duties, it is difficult to understand how the FDIC could prove its case without at least some of the testimony that the Accountants deride as "self-serving" and "speculative." To accept the Accountants' argument would allow them to profit from an uncertainty of their own creation, notwithstanding that "'"[t]he most elementary conceptions of justice

and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."'" *Furr v. AT & T Technologies, Inc.*, 824 F.2d 1537, 1548 (10th Cir.1987) (citations omitted). *Cf. Grubb v. F.D.I.C.*, 868 F.2d 1151, 1163 (10th Cir.1989) ("unique difficulty" in proving Rule 10b–5 reliance based on defendant's failure to disclose justifies presumption of reliance).

prevent the injury because indifferent to whether it occurred or not." *Folks v. Kansas Power & Light Co.*, 243 Kan. 57, 72, 755 P.2d 1319, 1332 (1988) (quoting *Cope v. Kansas Power & Light Co.*, 192 Kan. 755, 761, 391 P.2d 107 (1964)) (quoting *Frazier v. Cities Serv. Oil Co.*, 159 Kan. 655, 157 P.2d 822 (1945) (emphasis added by *Folks* court).

■ It is true that wantonness requires intent to *act,* as opposed to intent to bring about the consequences that act. *See Beck v. Kansas Adult Auth.*, 241 Kan. 13, 735 P.2d 222, 237 (1987). But presumably, the Accountants would not somehow inadvertently or unconsciously neglect to perform the specific omissions alleged by plaintiffs, in which case the requisite element of intent might be lacking. In other words, the only element of "intent" that plaintiffs need prove is that the Accountants intentionally performed or omitted certain acts. Whether the Accountants specifically knew that these acts and omissions constitute a breach of their duty is not the proper inquiry in determining whether they acted recklessly or wantonly.

■ Viewed under the proper standards, the court finds that a jury could reasonably conclude that the Accountants' alleged omissions were sufficiently egregious to constitute reckless and wanton conduct. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986) (summary judgment must be denied if there is sufficient evidence from which jury could infer defendant's tortious state of mind).

### 4. Statute of Limitations

Finally, the Accountants contend that the FDIC's claims based on the 1984 audit are barred by the Kansas two-year statute of limitations.

The parties agree that the applicable statute of limitations for the claims against the Accountants is the Kansas two-year statute. *See* K.S.A. § 60–513; *Brueck v. Krings*, 230 Kan. 466, 638 P.2d 904, 907 (1982). Under this statute, the action accrues when "the act giving rise to the cause of action first causes substantial in-

jury, or … [when] the fact of injury becomes reasonably ascertainable to the injured party…." K.S.A. § 60–513(b).

The claims based on the 1984 audit were not filed until December 1988. The Accountants contend that RCSA, and thus, the FDIC, knew or should have known of the existence of these claims at least by June 16, 1986, the date when RCSA filed suit against the Rupps for the same losses that the Accountants are alleged to have caused.

■ The Accountants first argue that it is irrelevant whether plaintiff had reason to suspect that *Fox* was responsible for the losses based on the 1984 audit, as long as plaintiff was aware of a substantial injury caused by *someone* during the 2–year period prior to December 1988. This argument is untenable. It is not only the injury, but also the wrongful act that must be "reasonably ascertainable" before the action accrues. *Roe v. Diefendorf*, 236 Kan. 218, 689 P.2d 855, syl. ¶ 1 (1984); *FDIC v. Ashley*, 754 F.Supp. 179, 183 (D.Kan.1990). The "wrongful act" alleged against Fox is its negligently performed 1984 audit. Therefore, the question is when it was reasonably ascertainable that this audit had caused the injuries of which plaintiff complains.

■ The Accountants also contend that no later than June 16, 1986, plaintiffs had knowledge of specific facts that should have caused them to investigate possible claims against Fox. Actual knowledge, however, and not mere suspicion of a wrong is required to trigger the running of the Kansas statute, and the action does not accrue during that time when the plaintiff has been lulled into confidence to forego further investigation. *Augusta Bank & Trust v. Broomfield*, 231 Kan. 52, 63, 643 P.2d 100, 108 (1982).

■ Plaintiff alleges that it had no actual knowledge of possible claims against the Accountants until April 1987, when the Accountants first produced their workpa-

pers for the 1985 audit.[9] The FDIC further alleges that the delay in investigating claims against the Accountants is attributable to the Accountants' fraudulent concealment of their wrongful conduct. This allegation is further supported by the fact that from July 1986 until June 1987, plaintiffs had actually retained the Accountants as litigation consultants against the Rupps—conduct that might be considered peculiar for an injured party who has reason to suspect the consultant of wrongdoing in the same litigation.

The court finds that this matter is rife with genuine issues of material fact. Accordingly, the jury will decide when plaintiffs' cause of action against the Accountants accrued. *See, e.g., Olson v. State Highway Commission,* 235 Kan. 20, 679 P.2d 167, 174 (1984).

### B. *Comeaus v. Accountants* (Doc. 817)

The Accountants move for summary judgment on all claims raised against them by the Comeaus and Rupp Financial Corporation (collectively, "the Comeaus").

The Comeaus and the Rupps entered into a stock sale agreement on August 27, 1985 that effectively gave the Comeaus 100% ownership of RCSA. The sale was not closed, however, until February 10, 1986. The Comeaus allege that the price they paid to purchase the Rupps' stock was based on the book value of RCSA as reported in its year-end June 30, 1985 financial statement. Grant conducted the 1985 audit of this statement. The Comeaus claim to have relied upon Grant's unqualified audit report and opinion giving a "clean bill of health" to the 1985 financial statement of RCSA. The Comeaus further claim that Fox recklessly performed the 1984 audit. The Comeaus seek damages resulting from

their purchase and redemption of the Rupps 70% stock ownership, as well as damages due to the diminution in the value of the Comeaus' preexisting 30% minority stock interest in RCSA. The Comeaus also seek punitive damages. The Comeaus claim relief against the Accountants under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10(b)(5); as well as under state law common law theories of breach of fiduciary relationship and reckless conduct.

#### 1. Section 10(b) and Rule 10b–5

■ Grant contends that the Comeaus cannot demonstrate that they justifiably relied on the 1985 audit report in purchasing the Rupps' 70% interest.

The plaintiffs have the burden of establishing every element of their § 10(b) and Rule 10b–5 claim by a preponderance of the evidence.[10] *Feldman v. Pioneer Petroleum, Inc.,* 813 F.2d 296, 301 (10th Cir.), *cert. denied,* 484 U.S. 954, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987). The court, however, must read § 10(b) and Rule 10b–5 flexibly, not technically or restrictively. *Farlow v. Peat, Marwick, Mitchell & Co.,* 956 F.2d 982, 986 (10th Cir.1992).

■ Justifiable reliance on the misrepresentation or omission is a necessary element to liability under § 10(b) and Rule 10b–5. *Zobrist v. Coal–X, Inc.,* 708 F.2d 1511, 1516 (10th Cir.1983). Several factors may be relevant in determining whether plaintiff's reliance was justifiable:

(1) the sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) wheth-

---

9. Plaintiffs first filed suit against Grant Thornton in September 1987, alleging losses from the 1985 audit. The Accountants did not produce their workpapers for the 1984 audit until ordered by the court on September 23, 1988. Arguably, therefore, the cause of action for the 1984 audit did not accrue until September 1988.

10. For a Rule 10b–5 claim that rests primarily on a failure to disclose, "reliance on the omission is presumed when the plaintiff establishes

that the defendant withheld material information and that the defendant owed the plaintiff a duty to disclose." *Grubb v. F.D.I.C.,* 868 F.2d 1151, 1163 (10th Cir.1989). Although the Comeaus have not invoked this burden shift, the court assumes for purposes of this motion that the Accountants must demonstrate that the Comeaus could not justifiably rely on the Accountants and their audits.

er the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

*Id.* No single factor is determinative and all must be considered and balanced. *Id.* at 1517. Moreover, the court must be mindful that

> [j]ustifiable reliance is not a theory of contributory negligence; rather, it is a limitation on a rule 10b–5 action which insures that there is a causal connection between the misrepresentation and the plaintiff's harm. Only when the plaintiff's conduct rises to a level of culpable conduct comparable to that of the defendant's will reliance be unjustifiable. *In this circuit, such conduct must amount to at least reckless behavior.*

*Id.* at 1516 (emphasis added; citations omitted). The element of justifiable reliance denies recovery to a plaintiff who has "close[d] his or her eyes and refuse[d] to investigate in disregard of a known risk or a risk so obvious that the plaintiff must be taken to have been aware of it." *Grubb v. FDIC*, 868 F.2d 1151, 1163 (10th Cir.1989).

Grant argues that the Comeaus had actual or constructive knowledge of the financial straits menacing the RCSA between August 1985—when the Comeaus and Rupps signed the purchase agreement—and February 1986—when the transaction was closed. Grant supports its argument with the following evidence:

1. Roger and Charles Comeau were directors of RCSA at all times relevant to this lawsuit. (Accountants' Motion for Summary Judgment, Doc. 817, Statement of Fact ¶ 3, at p. 7). The Comeaus contend that they were not involved in active management of RCSA between May 1983 and February 1986, which the court accepts as true for purposes of this motion.[11]

2. The stock agreement provided that the closing of the transaction was contingent upon an examination and audit of all internal records and documents of RCSA—to the satisfaction of the Comeaus. (Ext. 13 to Accountants' Motion, Doc. 818, ¶ 8, at p. 8).

3. Each month, the RCSA reported its loan delinquencies (loans past due 60 days or more) to the Federal Home Loan Bank Board ("FHLBB"). In these FHLBB reports,[12] the RCSA reported loan delinquencies of $985,00 at August 31, 1985; of $3.298 million at October 31, 1985; and of $3.611 million at December 31, 1985. It also reports the total regulatory net worth of the RCSA to be $2.617 million on August 31, 1985; $2.166 million on October 31, 1985; and $2.261 million on December 31, 1985. (Appendix to Memorandum and Order; Exts. 14, 15, 16 to Accountants' Motion, Doc. 818).

4. It is disputed whether the FHLBB reports were presented to the board of directors at their monthly meetings, and the Comeaus disavow actual knowledge of these reports. (Comeaus' Response, Doc. 860, at ¶¶ 27 & 31 pp. 17–19). It is undisputed, however, that a delinquent loan list was presented to and reviewed by the board at the monthly meetings. The delinquent loan list contained the name of the loan and the length of the delinquency, but not the amount. (Comeaus' Response, Doc. 860, at ¶ 27, pp. 17–18).

The Comeaus contend that their reliance on the 1985 audit was justified on the basis of several factors: the Comeaus were unsophisticated buyers who had no previous experience in investing in financial institutions; both the Rupps and the Accountants—long-time friends and/or associates of the Comeaus—were fiduciaries of the Comeaus; the Comeaus had no access to

---

11. The court notes, however, that the stock sale agreement provides that "[u]pon the execution of this agreement [the Comeaus] shall assume management and control of [RCSA]...." (Ext. 13 to Accountants' Motion, Doc. 818, ¶ 13, at p. 8).

12. The three exhibits furnished to the court are single pages containing two columns of figures. The columns of figures occupy only the top half

of the pages. Less than two dozen figures appear on the documents. By no stretch of the imagination is the loan delinquency information disclosed therein esoteric or difficult to decipher. It sets forth a single bottom-line figure of the total amount of loan delinquencies and requires no arithmetic computation from a column of figures.

**1148**

relevant information because they were "outside" directors who relied upon management to provide them with relevant financial information; the Rupps and the Accountants initiated the stock agreement; and the Accountants' 1985 unqualified report was a specific misrepresentation that RCSA's financial statements "present[ed] fairly the financial position of [RCSA] at June 30, 1985 and 1984...." The Comeaus also claim to have relied on the Accountants' repeated assurances, through the person of Roy Brungardt, that they would "take care of" the Comeaus throughout the stock sale transaction.

The Comeaus make no attempt to dispute the seriousness of the delinquent loans that had multiplied over a seven-month period to an amount far in excess of the net worth of the Association itself. In fact, the Comeaus offer no opposition to Grant's argument that, as a matter of law, actual knowledge of such information would preclude a finding of justifiable reliance on Grant's seven-month-old audit. Rather, the only defense presented by the Comeaus is that they had no actual knowledge of this information and justifiably relied upon other persons such as the Accountants to call it to their attention. Thus, for purposes of this motion, the question is whether a jury could reasonably find that the Comeaus justifiably failed to take personal notice of the precipitous rise in RCSA's delinquent loans to an amount exceeding the net value of the Association by a factor of almost two.

■■■■■ The court thinks not. It is true that Kansas law allows for a wide range of responsibilities for S & L directors, *see* K.S.A. §§ 17–5302, –5310 (duties fixed by bylaws), and that a director who has only a limited role in the corporation's affairs may rely upon the superior knowledge of another director or officer. *See Oberhelman v. Barnes Investment Corp.*, 236 Kan. 335, 338, 690 P.2d 1343 (1984); *Noll v. Boyle*, 140 Kan. 252, 255, 36 P.2d 330, 331 (1934) (director not in active charge of a corporation is not chargeable with the knowledge of those officers in active charge). Nonetheless, the law charges even an "outside"

director with such knowledge as he could have discovered in the exercise of reasonable care attending his responsibilities. *See Newton v. Hornblower, Inc.*, 224 Kan. 506, 582 P.2d 1136, syl. ¶ 6 (1978). In determining the scope of a particular director's responsibilities, the court must consider all the facts, including the nature of the corporation and the degree of attention and care that ordinary directors of like corporations would be expected to devote to the corporation's affairs. *See FSLIC v. Huff*, 237 Kan. 873, 879, 704 P.2d 372 (1985); *Sampson v. Hunt*, 233 Kan. 572, 584, 665 P.2d 743 (1983); *Speer v. Dighton Grain, Inc.*, 229 Kan. 272, 276, 624 P.2d 952 (1981).

■■■■ The corporation in this case is a savings and loan association, whose officers and directors are held to a heightened standard of conduct even among the general class of corporate officers. *Huff*, 237 Kan. at 879–80, 704 P.2d 372; *Comeau*, 762 F.Supp. at 1442. The general scope of knowledge that is chargeable to such corporate directors was stated in *Weigand v. Union Nat'l Bank of Wichita*, 227 Kan. 747, 610 P.2d 572 (1980):

> The directors of a corporation are chargeable with knowledge of such corporate affairs as it is their duty to keep informed of, *of the financial condition of the corporation, and of facts which the corporate books and records disclose.*

*Id.* at syl. ¶ 4 (emphasis added). In *Harman v. Willbern*, 374 F.Supp. 1149, 1161 (D.Kan.1974), *aff'd*, 520 F.2d 1333 (10th Cir.1975), this court stated: "[T]he directors of a corporation may not totally abandon their duties to the corporation or close their eyes to what is going on about them in the conduct of the business of the corporation and then use this as a defense for injury which results." *See also F.D.I.C. v. Lauterbach*, 626 F.2d 1327, 1334 (7th Cir.1980) ("A corporate director may not claim total ignorance of the corporation's affairs, particularly those matters fairly disclosed by the directors' meetings and those corporate records to which directors have access."); *Hoye v. Meek*, 795

F.2d 893, 896 (10th Cir.1986) ("directors and officers are charged with knowledge of those things which it is their duty to know and ignorance is not a basis for escaping liability"). Thus, although a director is not necessarily charged with knowledge of all affairs of the corporation, *Noll,* 140 Kan. at 255, 36 P.2d 330, each director—regardless of his level of involvement—assumes "the duty to keep abreast of the *general* financial status of the corporation; ...." *Harman,* 374 F.Supp. at 1163 (emphasis added).

The policy statements of the Federal Home Loan Bank Board expound upon the duty of S & L directors:

> The duty of care includes the responsibility of the directors to select and retain competent management; to oversee the activities of the institution by attending directors' meetings; *to require that adequate and reliable information is provided upon which they can make decisions;* to carefully review the documentation which is provided; to make the necessary policy decisions upon which management is to operate the institution[;] to monitor the activities that are delegated to the officers of the institution to insure that the board of directors' policies are being carried out; and to establish controls to assure themselves that the institution is being operated in a safe and sound manner and in compliance with law and regulations. *"Directors who willingly allow others to make major decisions affecting the future of the corporation wholly without supervision or oversight may not defend on their lack of knowledge, for that ignorance is itself a breach of fiduciary duty."*

FHLBB Memorandum R 62, Directors' Responsibilities, *published in* 52 Fed.Reg. 22,-682, 22,684 (June 15, 1987) (emphases added; quoting *Joy v. North,* 692 F.2d 880, 896 (2d Cir.1982), *cert. denied,* 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983)). *See also id.* ("All members of the board of directors, however, should regularly attend board meetings [and] read reports of the institution and the committees of the board....").

Accepting the Comeaus' argument for the moment, it is difficult to conceive of any duties that might remain to an S & L director who chooses not to play an active role in conducting the association's affairs. The failure of the Comeaus in this case goes beyond their mere non-involvement with the daily affairs of the association, which is permitted under the law. Nor does this case involve an isolated failure to notice an inconsequential or obscure change affecting the association's financial integrity (or even an isolated failure to notice a substantial, obvious change). The Comeaus, rather, repeatedly neglected over a period of several months to consult a routine monthly document, generated by their own association, that clearly sets forth a stark, easily understood fact: the amount of delinquent loans financed by the RCSA was growing by leaps and bounds. *Cf. Grubb v. FDIC,* 868 F.2d 1151, 1164 (10th Cir.1989) (plaintiff who had only limited time to investigate purchase and had no access to relevant information justifiably relied on seller's representations).

■■■■ The Comeaus defend with the contention that the Rupps and the Accountants were their fiduciaries, and that they were entitled to trust the judgment of their fiduciaries in matters for which the Comeaus had no expertise. For purposes of this motion, the court accepts that both the Rupps and the Accountants were fiduciaries of the Comeaus, and that the Comeaus lacked any expertise in conducting or understanding the affairs of financial institutions. The court will go even so far as to assume that the Comeaus had no business experience or acumen in any degree. These concessions, however, do not detract from the duty imposed by law upon S & L directors to take some *personal* steps to monitor the financial condition of the association to which each director is a fiduciary. The law recognizes that personal responsibility for some duties is so important to the community that they may not be delegated to another. *Trout v. Koss Constr. Co.,* 240 Kan. 86, 93 & syl. ¶ 5, 727 P.2d 450 (1986). *See also Lutz v. Peine,* 209 Kan. 559, 498 P.2d 60, syl. ¶ 3 (1972) (violation of a duty

or a law by plaintiff is contributory negligence that bars plaintiff's recovery if it is a proximate cause of the injury). In the court's view, directors of a savings and loan association, even if inactive in its daily affairs, must assume a non-delegable duty "to maintain some minimal degree of familiarity with corporate affairs...." *Lauterbach*, 626 F.2d at 1334. A contrary rule would be irreconcilable with the holding of *Huff*, 237 Kan. at 879–80, 704 P.2d 372.

Nor is the court persuaded by the argument that the Comeaus lacked expertise or ability to "audit" the books of the RCSA or to ascertain the accuracy of its financial statements. It does not require a degree in accounting (or for that matter, a degree in anything) to acquire and appreciate the significance of the information of which the Comeaus profess ignorance. Indeed, the Comeaus do not even attempt to argue that they could have justifiably relied on the June 1985 audit if they had actual knowledge of the amount of the loan delinquencies disclosed in the FHLBB reports. The only defense presented by the Comeaus is that they in fact had no actual knowledge of either the reports or the information contained therein, and that their ignorance of such information was justified. This defense is inimicable to the high standards of fiduciary duty imposed upon Kansas savings and loan directors, runs counter to the dictates of common sense, and is emphatically rejected by the court.

The position of the Comeaus is not unlike that of the plaintiff in *Zobrist v. Coal–X, Inc.*, 708 F.2d 1511, 1516 (10th Cir.1983), where the court overturned a jury's finding of justifiable reliance. In *Zobrist*, the plaintiff-buyer argued that he justifiably relied on the oral representations of the defendant-sellers when purchasing an interest in a coal mining operation. Although defendants had orally assured plaintiff that his investment "couldn't miss" and was a "sure thing," a private placement memorandum provided by defendants clearly stated the risks involved in the investment. The court held that plaintiff must be charged with constructive knowledge of the contents of the private placement memorandum, lest investors be

rewarded for their failure to read such a prospectus. Imputing such knowledge to the plaintiff, the court then concluded that, as a matter of law, plaintiff had "acted recklessly by intentionally closing his eyes to and failing to investigate the contradiction between the misrepresentations and the information in the memorandum." 708 F.2d at 1518–19.

In this case the reasons are even more compelling than in *Zobrist* for imputing knowledge of material information to the buyers. Unlike in *Zobrist*, the stock purchasers in this case were already members of the board of directors and minority owners of a corporation in which they sought to increase their investment. Moreover, the Comeaus failed not merely to protect their own interest, which was sufficient to defeat justifiable reliance in *Zobrist*, but also to protect the interests of third parties to whom the Comeaus owed fiduciary duties.

The issue is not whether the Comeaus could rely upon the Rupps or the Accountants in performing their duties, as they are unquestionably allowed to do under Kansas law. *See* K.S.A. §§ 17–6301(e), 17–6422 (in the performance of their duties, directors are entitled to rely in good faith on the opinions and reports of others). Rather, the issue is whether the Comeaus could delegate to others the *entire* performance of their duty to be knowledgeable about rudimentary indicators of the association's financial condition. Whatever else non-active, outside S & L directors may delegate to others, the court is confident under these facts that the Comeaus had a non-delegable duty to inquire personally into the status of RCSA's delinquent loans. As a matter of law, the Comeaus acted recklessly in closing their eyes to a routine financial report generated by association itself that discloses at a glance serious financial problems with the association. Based on this constructive knowledge, the Comeaus have no basis for claiming that they could have justifiably relied on the 1985 audit in consummating the stock sale agreement.

The Comeaus' purported reliance on the 1985 audit in purchasing the Rupps' stock becomes even more baffling in light of information of which the Comeaus indisputably had *actual* knowledge. At the February 10 closing of the stock sale agreement, the Comeaus, their attorney (A.J. Schwartz), the Rupps, and the Accountants discussed problems that had surfaced regarding the "Compadre loan." The Compadre loan was a $1 million loan secured by real estate collateral that was valued on the books of RCSA at $1.5 million. At the time of the February 10 closing, the Compadre property was in foreclosure. All parties were aware that the Compadre loan had been reappraised since the 1985 audit by a Vern Englehorn, who appraised the Compadre collateral at a value of only $200,000. There is also evidence that the value of the Compadre collateral had been reappraised at only $585,000. The Comeaus assert that they—under the advice of the Accountants—"dismissed or discounted" the Englehorn appraisal and proceeded to close the sale for a purchase price of $1.6 million.

Regardless of the accuracy of the Englehorn appraisal, the undisputed evidence establishes that sufficient problems existed with the Compadre loan to require further investigation by the Comeaus. The *potential* known loss on the Compadre loan ranged anywhere from $585,000 to $800,000—or 28% to 38% of the reported net worth of RCSA. At the February 10 closing, the Comeaus even tried to account for this by renegotiating a $200,000 reduction in the valuation of Compadre, which in turn would reduce the purchase price. The Rupps made a counteroffer to reduce the purchase price by $70,000. The Comeaus refused the counteroffer, however, abandoned any effort to mitigate a known potential loss, and signed the agreement on its original terms. Thus, notwithstanding the Comeaus' actual knowledge of information the gravity of which is belied by the Comeaus' own actions, the Comeaus pro-

ceeded to purchase the stock on terms that assumed accuracy of the audit.

The Comeaus also concede actual knowledge of a growing number of delinquent loans, albeit with a disclaimer of actual knowledge as to the amount of these delinquent loans. But it requires no great exercise of intellect to realize that an increase in the number of delinquent loans between the time of the audit and the closing date raises doubts as to the current reliability of that audit. Here too, the Comeaus failed to conduct further investigation.

■■■ The Comeaus attempt to justify this conduct by noting that they "expressly reserved their rights and remedies under the contract," (Doc. 860, Comeaus' Response, at ¶ 36, p. 21), thus implying that they foresaw legal action as a means to redress any loss on their purchase. The element of justifiable reliance, however, insures that a plaintiff seeking recovery under § 10(b) has taken preventative action to avert a known potential loss. A plaintiff cannot justifiably rely on the courts to remedy an injury that the plaintiff was in a position to prevent in the first place.

For these reasons, the court concludes that the Comeaus have failed to demonstrate a genuine issue of fact as to the element of justifiable reliance on the 1985 audit. The court discerns no allegation in the pretrial order or in plaintiffs' present arguments that the violations alleged by the Comeaus under § 10(b) and Rule 10b–5 relate to any conduct other than the purchase of the Rupps' stock. Accordingly, summary judgment will be granted in favor of the Accountants on the federal securities claims.

### 2. Breach of Fiduciary Duty and Reckless Conduct

The Comeaus allege two state common law claims against the Accountants: breach of fiduciary duty and reckless conduct.[13]

■■■ For purposes of this motion, the court assumes as true that Grant owed

---

**13.** Upon the Comeaus' motion for voluntary dismissal, the court has previously dismissed the Comeaus' negligence claim with prejudice.

some fiduciary duties to the Comeaus, which were breached, and that Grant acted recklessly in performing the 1985 audit. *See Gillespie v. Seymour,* 14 Kan.App.2d 563, 568, 796 P.2d 1060 (1990) (whether accountants owe fiduciary duty depends on facts of each case); *cf. Bily v. Arthur Young & Co.,* 3 Cal.4th 370, 11 Cal.Rptr.2d 51, 834 P.2d 745 (1992) (auditors liable to third parties for negligent misrepresentation only if plaintiff justifiably relies on audit). The court has also found, however, that the Comeaus themselves had a nondelegable fiduciary duty to keep abreast of the RCSA's general financial condition, which duty was recklessly breached by their failure to inform themselves personally of the amount of delinquent loans as of February 10, 1986 and before.

■ The court finds that this conduct on the part of the Comeaus precludes relief under either state common law theory. Although the contributory negligence of a plaintiff is not a defense to a defendant's reckless conduct, reckless conduct on the part of the plaintiff is a defense to similar conduct of the defendant. *Bogle v. Conway,* 198 Kan. 166, 169, 422 P.2d 971 (1967); *Kniffen v. Hercules Powder Co.,* 164 Kan. 196, 188 P.2d 980, syl. ¶ 4 (1948); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 65, at 462 (5th ed. 1984) (citing Restatement (Second) of Torts §§ 482(2) & 503(3)); *cf. Goben v. Barry,* 234 Kan. 721, 727, 676 P.2d 90 (1984) (where the conduct of both plaintiff and defendant is equally culpable, the parties are said to be *in pari delicto,* and the court will leave the parties where it found them); *Early Detection Center, Inc. v. Wilson,* 248 Kan. 869, 879, 811 P.2d 860 (1991). Thus, even assuming that the Accountants were reckless, the Comeaus' own reckless conduct defeats any claim for relief under this theory.

■ The Comeaus are likewise foreclosed from any claim of a breach of fiduciary duty against the Accountants. If the Comeaus had been reckless in failing to protect *only* their own interests in the stock sale, the court might be inclined to allow a jury to determine the Comeaus'

right to recovery under this theory. In a sense, accountants may be said to assume a duty to protect clients from their own negligent management of their affairs. *See generally Fullmer v. Wohlfeiler & Beck,* 905 F.2d 1394, 1396–99 (10th Cir.1990); *Lincoln Grain, Inc. v. Coopers & Lybrand,* 216 Neb. 433, 345 N.W.2d 300, 307 (1984); *Greenstein, Logan & Co. v. Burgess Mktg., Inc.,* 744 S.W.2d 170, 190 (Tex. Ct.App.1987); *Jewelcor Jewelers & Distribs. v. Corr,* 373 Pa.Super. 536, 551–52, 542 A.2d 72, 79–80 (1988), *appeal denied,* 524 Pa. 608, 569 A.2d 1367 (1989). Arguably, therefore, even reckless conduct on the part of the usual client might not be a bar to recovery against a reckless accountant.

But in this case, the Comeaus wholly abandoned every aspect of *their* non-delegable fiduciary duty toward depositors and the public to keep abreast of RCSA's general financial condition by conducting some modicum of personal inquiry. Had the Comeaus informed themselves of the amount of delinquent loans, knowledge of which must be imputed to them, they could not have reasonably proceeded with the sale. Thus, the Comeaus cannot claim that the Accountants breached a fiduciary duty that the law does not allow the Comeaus to delegate, and the fulfillment of which would have prevented the injury of which they now complain.

Because the court has found as a matter of law that the Comeaus recklessly breached their independent fiduciary duties to the Association, the court finds that the Comeaus cannot recover under the state law theories.

Accordingly, the court will grant summary judgment in favor of Grant on the Comeaus' state common law claims of breach of fiduciary duty and recklessness.

### 3. Standing to Assert Claims Against Fox

Although the Comeaus are not completely clear on the matter, it appears that no conduct attributed to Fox relates to the damages arising from the purchase of the Rupps' stock. Rather, the tortious conduct alleged against Fox, who played no role in

the 1985 audit, consists entirely of its failure to perform a GAAS audit for the 1984 year. As a result of this conduct, the Comeaus claim that the RCSA directors were not informed of the impaired financial health of RCSA and were unable to take corrective action. Fox's actions are said to have caused the Comeaus to lose the entire value of their original 30% interest in RCSA.

■ Fox argues that the Comeaus have no standing to assert this claim because the diminution in the value of the Comeaus' stock is an injury that is secondary to the primary injury to the corporation. "It is well settled that 'a shareholder does not have standing to redress an injury to the corporation in which it holds stock.'" *K–B Trucking Co. v. Riss Int'l Corp.,* 763 F.2d 1148, 1154 n. 7 (10th Cir.1985) (quoting *EMI Ltd. v. Bennett,* 738 F.2d 994, 997 (9th Cir.1984)). *See also Speer v. Dighton Grain, Inc.,* 229 Kan. 272, 284 & syl. ¶ 9, 624 P.2d 952 (1981) (breach of duty to corporation may be prosecuted only by corporation or someone suing on its behalf). This rule is particularly well established when the only injury alleged by the shareholder is the diminution in the value of his stock:

"An action to redress injuries to a corporation cannot be maintained by a shareholder in his own name but must be brought in the name of the corporation. The shareholder's rights are merely derivative and can be asserted only through the corporation. Although this rule does not apply in a case where the shareholder shows a violation of duty owed directly to him, diminution in value of the corporate assets is insufficient direct harm to give the shareholder standing to sue in his own right."

*Warren v. Manufacturers Nat'l Bank,* 759 F.2d 542, 544 (6th Cir.1985) (quoting *Stevens v. Lowder,* 643 F.2d 1078, 1080 (5th Cir.1981), and citing cases). Thus, "when the alleged injury is inflicted upon the corporation and the only injury to the shareholder is the indirect harm which consists in the diminution in value of his corporate shares resulting from the impairment of

corporate assets, ... it has been consistently held that the primary wrong is to the corporate body and, accordingly, that the shareholder, experiencing no direct harm, possesses no primary right to sue." *Kauffman v. Dreyfus Fund, Inc.,* 434 F.2d 727, 732 (3d Cir.1970), *cert. denied,* 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971). *Accord Papilsky v. Berndt,* 466 F.2d 251, 255 (2d Cir.), *cert. denied,* 409 U.S. 1077, 93 S.Ct. 689, 34 L.Ed.2d 665 (1972); *Meyerson v. Coopers & Lybrand,* 233 Neb. 758, 448 N.W.2d 129, 133–34 (1989) (no cause of action for shareholders against negligent accounting firm for claim of diminution in value of stock); 12B W. Fletcher, *Cyclopedia of Corporations* §§ 5913 & 5924 (perm. ed. 1984).

■ The Comeaus do not dispute the validity of this rule, but contend that their claim against Fox falls under an exception to the rule. This exception provides the shareholder with a cause of action when the wrongful act also violates a separate, independent duty owed to the shareholder. *See* 12B W. Fletcher, *Cyclopedia of Corporations* § 5913, at 434 (perm. ed. 1984), & *id.* § 5924, at 110 (Supp.1991); *Process Components, Inc. v. Baltimore Aircoil Co.,* 89 N.C.App. 649, 366 S.E.2d 907, *aff'd,* 323 N.C. 620, 374 S.E.2d 116 (1988). According to the Comeaus, Fox owed the Comeaus a fiduciary duty, the breach of which caused the Comeaus the loss of the stock purchase and redemption price and also their existing 30% interest in RCSA. "In short, the Comeaus' claims against Fox are based not upon the Comeaus' capacity as minority stockholders but as purchasers in the stock sale transaction with the Rupps." (Comeaus' Response, Doc. 860, at 53).

It appears that the Comeaus allege an independent breach of fiduciary duty against Fox only for some undisclosed role that Fox played in the stock sale transaction. Even assuming that Fox somehow owed the Comeaus a fiduciary duty during the stock sale transaction, the court has already ruled that the Comeaus have no claim against the Accountants for their alleged role in the stock sale agreement. Moreover, the Comeaus make no attempt

to argue that the alleged fiduciary duty owed by the Accountants pertains to anything other than the stock sale agreement. Nor do the Comeaus present any evidence supporting an inference that prior to the stock sale transaction, Fox stood in a fiduciary relationship to them in their capacity as minority RCSA stockholders. The Comeaus have failed to establish that prior to the stock sale transaction, Fox owed them any duty independent of that owed to RCSA.

The court finds that the claim against the Accountants for diminution in the value of the Comeaus' initial 30% interest is a claim possessed only by the Association. It follows that the Comeaus lack standing to pursue this claim.

### C. *Accountants v. A.J. Schwartz* (Doc. 814)

■ Third-party defendant A.J. Schwartz moves for summary judgment on the indemnity claims made against him by the Accountants. The court has previously addressed the nature of these claims. *See Comeau*, 762 F.Supp. at 1445–449. In essence, the Accountants seek indemnity from Schwartz to the extent that they are found liable to the Comeaus.

Because the court has concluded that the Comeaus' claims against the Accountants are not viable, the Accountants have no basis for claiming indemnity from Schwartz for liability on those claims. Accordingly, summary judgment must be granted in favor of Schwartz.

### D. *Comeaus v. Rupps*

The Comeaus seek recovery from the Rupps only for the losses sustained as a result of the stock sale transaction. Specifically, the Comeaus allege that the Rupps withheld material information from the Comeaus with respect to the stock sale agreement. The Comeaus allege that this conduct violated § 10(b) of the Securities Act of 1934; § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* (2), and K.S.A. §§ 17–1253(a), –1268(a). The Comeaus further allege that this same conduct constitutes a breach of fiduciary duty owed to

the Comeaus; a breach of the stock sale agreement; and fraudulent inducement to purchase and close on the stock sale of RCSA. (Pretrial Order, Doc. 941, at p. 126).

#### 1. Federal Securities Claims

##### a. *§ 10(b) of the Securities Act of 1934*

■ The court has concluded that the Comeaus have failed to demonstrate a genuine issue of fact with respect to the element of justifiable reliance on their § 10(b) claim against the Accountants. This finding dictates the same conclusion with respect to the § 10(b) claim against the Rupps.

As the court has already discussed, the Comeaus had both the means, and importantly, the duty to inform themselves personally of the status of RCSA's delinquent loans. Although the Comeaus raise serious allegations of fraud against the Rupps, there is no allegation that the Rupps or anyone else actively concealed the FHLBB reports from the Comeaus. Indeed, there is evidence that the Comeaus actually sent a current FHLBB report to Bryan Ronck, who was ultimately selected by the Comeaus to serve as RCSA's president and chief operating officer. (Ronck Depo., 5/89, pp. 17–21, Attachment to Accountants' Reply in Support of Summary Judgment, Doc. 899). As the Comeaus themselves concede, "[t]here would be no reason for the Comeaus, as outside directors, to investigate or review the institution's loan files *absent some warning or red flag raised.*" (Comeaus' Response, Doc. 881, at 49; emphasis added). Because the court has concluded that the rising amount of RCSA's delinquent loans was such a "red flag," knowledge of which must be imputed to the Comeaus, the Comeaus' § 10(b) claim against the Rupps must fail for lack of justifiable reliance.

##### b. *§ 12(2) of the Securities Act of 1933*

■ This court has recently concluded that § 12(2), 15 U.S.C. § 77*l* (2), applies only in the context of initial offerings of securities. *Professional Serv. Indus., Inc. v. Kimbrell*, Civ. Action No. 90–1326–B, 1992 WL 40639 at *1–3 (D.Kan. filed July

14, 1992). *See Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682 (3d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991); *Bank of Denver v. Southeastern Capital Group, Inc.*, 763 F.Supp. 1552, 1558–59 (D.Colo.1991) (citing cases). Because the sale of stock in this case was not an initial distribution, § 12(2) provides the Comeaus with no basis for relief. Summary judgment will be granted in favor of the Rupps as to this claim.

### 2. State Law Claims

■ With the dismissal of all federal claims alleged by the Comeaus, a question arises concerning this court's subject matter jurisdiction over the state law claims of the Comeaus. The court addresses this issue *sua sponte*, as it must. *See* Fed. R.Civ.P. 12(h)(3); *Tuck v. United Servs. Auto. Ass'n*, 859 F.2d 842, 844 (10th Cir. 1988), *cert. denied*, 489 U.S. 1080, 109 S.Ct. 1534, 103 L.Ed.2d 839 (1989).

■ The constitutional power to assert pendent jurisdiction over state law claims comprises two requirements: (1) the federal claim must have sufficient jurisdictional substance; and (2) the federal and state claim must derive from a common nucleus of operative fact. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Once the constitutional power is found to exist, the court must then consider the discretionary factors of judicial economy, fairness to the litigants, and comity in the federal system. *Id.* at 726, 86 S.Ct. at 1139.

Although the court has dismissed the federal securities claims of the Comeaus, the court has no doubt that it has the constitutional power to hear the Comeaus' state claims. For purposes of pendent jurisdiction, a federal claim is substantial if it is sufficient to confer subject matter jurisdiction on the court. *Miller v. Glanz*, 948 F.2d 1562, 1567 (10th Cir.1991). "A federal claim is insubstantial only if it is 'obviously without merit or is wholly frivolous,' or 'is clearly foreclosed by prior decisions of the Supreme Court.'" *Plott v. Griffiths*, 938 F.2d 164, 167 (10th Cir.1991) (quoting 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3564, at 68–70 (2d ed. 1984)). In this case, only after extensive discovery has it become apparent that the Comeaus cannot demonstrate justifiable reliance on their claim under § 10(b), which might otherwise be meritorious. Moreover, the § 12(2) claim of the Comeaus has been dismissed only as a result of recent restrictive interpretations of that statute by this court and others. Nor is there any question but that the dismissed federal claims and the remaining state claims derive from the same common nucleus of operative fact. The only question concerns the propriety, as opposed to power, of exercising jurisdiction over state claims pendent to federal claims dismissed before trial.

■ When the federal claims of one party are dismissed before trial, and in the absence of pendent party jurisdiction as a possibility,[14] the court will normally dismiss

**14.** Pendent party jurisdiction refers to jurisdiction over state law claims between two parties who are not named in a claim that is cognizable federal court. *See, e.g., Finley v. United States*, 490 U.S. 545, 549, 109 S.Ct. 2003, 2006, 104 L.Ed.2d 593 (1989). It may arise when a plaintiff with a federal claim against one defendant seeks to add state claims against another defendant, *id.*, or when, as here, a plaintiff with no federal claim asserts a state claim against a defendant that another plaintiff has sued under a federal claim. *See, e.g., Bolin v. Cessna Aircraft Co.*, 759 F.Supp. 692, 714–16 (D.Kan.1991). Although Congress recently enacted a blanket grant of "supplemental jurisdiction" to claims that arise under federal law, *see* Judicial Improvements Act of 1990, Pub.L. No. 101–650, § 310, 104 Stat. 5089, 5113–14 (1990) (codified at 28 U.S.C. § 1367), this statutory grant of

pendent party jurisdiction does not apply to this case, which was filed before December 1, 1990. *See id.* § 310(c); *Loeber v. Bay Tankers, Inc.*, 924 F.2d 1340, 1345 n. 3 (5th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 78, 116 L.Ed.2d 51 (1991). Courts generally interpret the law predating this statute to require an affirmative congressional grant of pendent party jurisdiction under the specific jurisdictional statute for each case. *See Lockard v. Missouri Pac. R.R. Co.*, 894 F.2d 299, 301 (8th Cir.), *cert. denied*, 498 U.S. 847, 111 S.Ct. 134, 112 L.Ed.2d 102 (1990); *but see Cooperativa Ahorro v. Kidder, Peabody & Co.*, 777 F.Supp. 153, 160 (D.P.R.1991) (interpreting *Finley* narrowly to require evidence of congressional exclusion of pendent party jurisdiction); *cf. Bolin*, 759 F.Supp. at 714–16 & n. 28 (assuming requirement of affirmative grant, but finding grant under CERCLA). In this case, the

the state law claims of that party as well. *Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139; *Thatcher Enters. v. Cache County Corp.*, 902 F.2d 1472, 1478 (10th Cir.1990). However, this general rule is not an inexorable command that is to be applied inflexibly in all cases. *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d 720 (1988). Even when federal claims are eliminated before trial, the court must consider all the factors of judicial economy, convenience, fairness, and comity in deciding whether to exercise pendent jurisdiction. *Id.; Sullivan v. Scoular Grain Co.*, 930 F.2d 798, 803 (10th Cir.1991). "A federal court justifiably may retain jurisdiction of the pendent claims if substantial time and energy have been expended on the case prior to disposition of the federal claims." *Jones v. Intermountain Power Project*, 794 F.2d 546, 550 (10th Cir.1986). *Accord Sullivan*, 930 F.2d at 803–04.

■ The court finds that the relevant considerations overwhelmingly favor the exercise of jurisdiction over the Comeaus' state claims. After several years and an inordinate expenditure of resources by both court and counsel, discovery is complete and the case is ready for trial. Moreover, piecemeal litigation of this case to separate juries would very likely be confusing and a waste of judicial time. Thus, the court will proceed to the merits of the state claims.

### a. *Securities Claims*

The Comeaus seek to recover against the Rupps under K.S.A. §§ 17–1253(a), and 17–1268(a).

■ The court first notes that the Rupps raise an argument by way of footnote to the timeliness of the RFC's claim

statutory basis for jurisdiction over the FDIC's federal common law claims is 12 U.S.C. § 1819(b). *See FDIC v. Clark*, 978 F.2d 1541, 1544 (10th Cir. 1992); *supra* note 3 and accompanying text. The court notes that at least two courts have found a congressional grant of pendent party jurisdiction in the language of 12 U.S.C. § 1730(k)(1) (1988)—the predecessor to 12 U.S.C. § 1819(b) (Supp. II 1990)—and that both statutes contain similar language. *See FSLIC v. Mackie*, 962 F.2d 1144, 1148–50 (5th Cir.1992); *California Union Ins. Co. v. American*

under Kansas securities law. Although the Comeaus promptly filed their claim on June 16, 1986, the RFC was not added as a party plaintiff until September 25, 1987. (Doc. 46). Noting that the federal securities statutes are governed by a one-year statute of limitations, *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, —— U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), and that "[t]here is no authoritative statement of the statute of limitations applicable to K.S.A. 17–1268," (Memo. in Support of Motion, Doc. 803, at 52 n. 6), the Rupps urge the court to adopt the one-year federal time period to bar the RFC's claim.

The court addressed this precise argument in its Order of June 28, 1988, (Doc. 162, at 17 (per Crow, J.)), and determined that a claim under K.S.A. § 17–1268(a) is governed by the three-year period of K.S.A. § 60–512(2) to recover on a statutory liability. Plaintiff–RFC's state securities claims are timely.

The Kansas Securities Act is a remedial statute, and the court must interpret it liberally in order to effect its purposes. *State ex rel. Mays v. Ridenhour*, 248 Kan. 919, 934, 811 P.2d 1220 (1991); *Taylor v. Perdition Minerals Group, Inc.*, 244 Kan. 126, 132, 766 P.2d 805 (1988). To this end, the court should also turn to the decisions of other state and federal courts that have interpreted similar provisions. *Ridenhour*, 248 Kan. at 934, 811 P.2d 1220. Ultimately, however, the interpretations given similar statutes are not controlling, *see id.* at 940, 811 P.2d 1220, and the court must apply Kansas rules of statutory construction in interpreting Kansas statutes. *Taylor*, 244 Kan. at 131–33, 766 P.2d 805.

*Diversified Savings Bank*, 914 F.2d 1271, 1273–74 (9th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 966, 112 L.Ed.2d 1052 (1991); *but see FDIC v. Howse*, 802 F.Supp. 1554 (S.D.Tex.1992) (no pendent party jurisdiction under § 1819); *FDIC v. Israel*, 739 F.Supp. 1411 (C.D.Cal.1990) (no ancillary jurisdiction under § 1819 for defendant's indemnity cross-claims). Given the court's finding of jurisdiction over the entire case on alternative grounds, it is unnecessary to resolve this issue.

■ Section 17–1253(a) closely tracks the language of Rule 10b–5, and the Comeaus themselves contend that the state and federal causes of action have identical elements. *See Farney v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* Civ. A. No. 86–2576, slip op. at 11 (D.Kan. filed Jan. 21, 1988) (1988 WL 156237). Because the element of justifiable reliance is not present for the federal claim, neither can the Comeaus prevail on their claim under K.S.A. § 17–1253(a).[15]

■ The Comeaus also seek relief under K.S.A. § 17–1268(a), which provides:

Any person, who ... offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made in the light of the circumstances under which they are made not misleading (the buyer not knowing of the untruth or omission) and who does not sustain the burden of proof that such person did not know and in the exercise of reasonable care could not have known of the untruth or omission, is liable to the person buying the security from such person,....

The Rupps contend that K.S.A. § 17–1268(a), like § 12(2) of the Securities Act of 1933, applies only to initial offerings. The Rupps urge this result based not upon the language of the state statute, but only upon the observation that K.S.A. § 17–1268(a) is frequently referred to as the "state version" of § 12(2).

The court must begin its analysis with the language of the statute, whose "words and phrases [must] be construed according to the context and approved usage of the language." *Taylor,* 244 Kan. at 131, 766 P.2d 805.

Although the state and federal statutes resemble each other in many respects, K.S.A. § 17–1268(a) does not contain the language found in § 12(2) that has led this court and others to conclude that § 12(2) applies only to initial offerings. Section 12(2) creates a cause of action against any person who

offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, *by means of a prospectus or oral communication,* which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission),....

15 U.S.C. § 77*l* (2) (emphasis added). By contrast, K.S.A. § 17–1268(a) omits the language emphasized above, providing only that liability may be imposed against

[a]ny person, who ... offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made in the light of the circumstances under which they are made not misleading (the buyer not knowing of the untruth or omission)....

The omission from the Kansas statute of any reference to "a prospectus or oral communication" is critical, because it is precisely such language that "supports a reading restricted to initial distributions." *Ballay v. Legg Mason Wood Walker, Inc.,* 925 F.2d 682, 688 (3d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991).

Nor does the court find any other language on the face of K.S.A. § 17–1268(a) indicating that it applies only to initial offerings. To the contrary, the Kansas statute does not limit the cause of action to those sales of securities transacted through a particular instrument of communication. It broadly prohibits the sale of securities "by means of any untrue statement of a material fact or any omission to state a material fact," regardless of how that un-

---

**15.** A question exists whether K.S.A. § 17–1253(a) even creates an independent basis for relief, or simply proscribes certain acts for which statutes such as K.S.A. § 17–1268 provide a remedy. *See Conrady v. Ribadeneira,* No. 86–1745–C, slip op. at 9 (D.Kan. filed Apr.1990) (1990 WL 66603).

**1158**

true statement or omission may be communicated.

The Comeaus also note that the Kansas Securities Act does not place any limitations on its definition of "sale" and "offer to sell." Rather, K.S.A. § 17–1252(h) simply provides:

(1) "Sale" or "sell" includes *every* contract of sale of, contract to sell, or disposition of, a security or interest in a security for value.

(2) "Offer" or "offer to sell" includes *every* attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value.

(emphases added).

The court finds that K.S.A. § 17–1268(a), unlike its federal counterpart, is not limited to initial offerings.

■ Turning to the elements of K.S.A. § 17–1268(a), the Rupps apparently agree that the inquiry under this section focuses on plaintiff's actual rather than constructive knowledge of the material misrepresentations or omissions alleged against the seller. This interpretation is consistent with the statutory language of K.S.A. § 17–1268(a) and with the interpretation given to § 12(2). *See MidAmerica Fed. Savings & Loan Ass'n v. Shearson/American Express, Inc.,* 886 F.2d 1249, 1256–57 (10th Cir.1989); *cf. Gilbert v. Nixon,* 429 F.2d 348, 356 (10th Cir.1970) (although § 12(2) does not require purchaser to prove that he could not have discovered falsity upon reasonable investigation, statute does require buyer to prove "excusable neglect"); *Stone v. Fossil Oil & Gas,* 657 F.Supp. 1449, 1459 (D.N.M.1987); *Gale v. Great S.W. Exploration,* 599 F.Supp. 55, 57 (N.D.Okl.1984). Thus, in order to prevail under K.S.A. § 17–1268(a), the Comeaus must prove that they had no actual knowledge of the material misrepresentations or omissions made by the Rupps, but plaintiffs need not prove that they could not have discovered the truth with reasonable inquiry.

■ There is considerable dispute as to what the Comeaus actually knew regarding the financial condition of RCSA at the time

of the February 10, 1986 closing. As the court has already noted, the Comeaus had actual knowledge of certain information that undermines their claim of justifiable reliance on the acts and omissions of both the Accountants and the Rupps. *Supra* at 1150–1151. Justifiable reliance on the misrepresentation, however, is not an element that appears on the face of § 17–1268(a). Nor is reliance, justifiable or otherwise, an element that the courts have engrafted on the federal analog of § 17–1268(a). *See MidAmerica,* 886 F.2d at 1256; *Gilbert,* 429 F.2d at 356–57; *Akerman v. Oryx Communications, Inc.,* 810 F.2d 336, 344 (2d Cir.1987). Rather, the only possible "causation" element contained in K.S.A. § 17–1268(a) is that the misrepresentation or omission be material. *Cf. Taylor,* 244 Kan. 126, 766 P.2d 805, syl. ¶ 3 (liability exists under K.S.A. § 17–1268(b) even if director does not materially aid in illegal sale of securities); *Ridenhour,* 248 Kan. at 940, 811 P.2d at 1234 (adopting "but for" causation test to establish aider and abetting liability under K.S.A. § 17–1255); *Wilson v. Ruffa & Hanover, P.C.,* 844 F.2d 81 (2d Cir.1988) ("loss causation" element of § 12(2) claims against collateral participants).

The statute itself indicates only that a material fact or omission is one that is "necessary in order to make the statements made in the light of the circumstances under which they are made not misleading...." K.S.A. § 17–1268(a). In *Allen v. Schauf,* 202 Kan. 348, 449 P.2d 1010 (1969), the court considered a plaintiff's challenge to the trial court's denial of recovery under K.S.A. § 17–1268(a). The court stated:

The first essential element for recovery under the statute is that the person selling the security makes an untrue statement of a material fact or an omission to state a material fact. Materiality was defined in *McGuire v. Gunn,* 133 Kan. 422, 300 Pac. 654 [1931], as follows:

"A representation is material where it relates to some matter which is so substantial and important as to influence the party to whom it is made."

202 Kan. at 359, 449 P.2d at 1019 (quoting 14 C.J. 602, 605). The court went on to find that the district court could reasonably find that defendants had made no untrue statements of material fact.

The court does not read *Allen v. Schauf* to introduce an element of reliance into the definition of materiality under K.S.A. § 17–1268(a). The precise basis for the trial court's findings in that case, as affirmed by the Kansas Supreme Court, was that the plaintiffs were fully informed and had actual knowledge of the alleged misrepresentations. Because such actual knowledge defeats a separate essential element of the cause of action, the decision provides little guidance for defining materiality under the statute.

■ Courts have interpreted § 12(2) of the Securities Act of 1933 in a manner that views the materiality of a statement in objective, rather than subjective, terms. *See, e.g., Gilbert,* 429 F.2d at 356. That is, whether a fact or omission of fact is material is viewed from the standpoint of a reasonable or prudent investor, in light of all the circumstances, "including the subject matter and the relationship of the parties, . . . ." *Gilbert,* 429 F.2d at 356. Moreover, in order to be material under federal securities law, a misrepresentation or omission need not be "outcome-determinative," in the sense that it actually would have caused a reasonable investor to have acted differently. *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (§ 14(a) of 1934 Act); *Folger Adam Co. v. PMI Indus., Inc.,* 938 F.2d 1529, 1533 (2d Cir.) (§ 12(2) of 1933 Act), *cert. denied,* — U.S. —, 112 S.Ct. 587, 116 L.Ed.2d 612 (1991). Rather, the plaintiff need only make "a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder," or that a reasonable investor would have viewed disclosure of the information "as having significantly altered the 'total mix' of information available." *TSC Indus.,* 426 U.S. at 449, 96 S.Ct. at 2132. *See also Basic Inc. v. Levinson,* 485 U.S.

224, 231–32, 108 S.Ct. 978, 983–84, 99 L.Ed.2d 194 (1988) (adopting same definition for § 10(b) claims); *Hassig v. Pearson,* 565 F.2d 644, 650 (10th Cir.1977); *State v. Puckett,* 6 Kan.App.2d 688, 691–93, 634 P.2d 144 (1981) (in criminal proceeding for illegal sale of securities, jury question presented was whether defendant's omission was material, *i.e.,* "was there a substantial likelihood that a reasonable investor would consider [undisclosed information] important in deciding whether to purchase securities"), *aff'd on other grounds,* 230 Kan. 596, 640 P.2d 1198 (1982).

The federal definition of materiality is also consistent with this element in the context of Kansas law for fraudulent misrepresentation. For such purposes, Kansas defines a statement or omission as material "if it is one to which a reasonable person would attach importance in determining his choice of action in the transaction involved." *Timi v. Prescott State Bank,* 220 Kan. 377, 389 & syl. ¶ 7, 553 P.2d 315 (1976). *See also Lynn v. Taylor,* 7 Kan.App.2d 369, 642 P.2d 131, syl. ¶ 1 (1982); *Lesser v. Neosho County Community College,* 741 F.Supp. 854, 864 (D.Kan. 1990); Restatement (Second) of Torts § 538(2)(a) (1979).

■ Thus, in order to establish liability under K.S.A. § 17–1268(a), the court finds it irrelevant whether the Comeaus actually, reasonably, or justifiably relied upon the misrepresentations or omissions of the Rupps. The Comeaus need only prove that: (1) the Rupps made misrepresentations or omissions that were material, in the sense that a reasonable investor, under all the circumstances, would have attached actual significance or importance to the information in making his decision; and (2) that the Comeaus had no actual knowledge of the material misrepresentations or omissions.

■ Viewing the evidence in a light most favorable to the Comeaus, the court has no difficulty finding that a jury could reasonably find the alleged misrepresentations and omissions of the Rupps to be material. The evidence also discloses genuine issues of fact regarding the extent of

the Comeaus' actual knowledge of these alleged omissions.

■ For their final argument the Rupps contend that the Comeaus' claim under K.S.A. § 17–1268(a) should fail because the Comeaus are *in pari delicto* with the defendants.

The Supreme Court has recognized the defense of *in pari delicto* for claims made under any of the federal securities laws. *Pinter v. Dahl,* 486 U.S. 622, 635, 108 S.Ct. 2063, 2072, 100 L.Ed.2d 658 (1988). Under the federal test, the defense is available against alleged securities violations

> "only where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility *for the violations he seeks to redress,* and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public."

*Id.* at 633, 108 S.Ct. at 2071 (emphasis added; quoting *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 310–11, 105 S.Ct. 2622, 2629, 86 L.Ed.2d 215 (1985)). "The first prong of this test captures the essential elements of the classic *in pari delicto* doctrine," *id.,* which limited the defense "to situations where the plaintiff bore 'at least substantially equal responsibility for his injury,' and where the parties' culpability *arose out of the same illegal act.*" *Id.* at 632, 108 S.Ct. at 2070 (emphasis added; citations omitted).

The court finds that the defense of *in pari delicto* is unavailable to the Rupps for the alleged securities violations. As the Court recognized in *Pinter,* the doctrine was a defense at common law only when the plaintiff had participated in the same violation alleged against the defendant. Although the Comeaus breached their fiduciary duty to their depositors and to the public, this is not the same violation alleged against the Rupps under K.S.A. § 17–1268(a). The only manner in which the Comeaus might be considered to have "participated" in violating K.S.A. § 17–1268(a) is by purchasing the Rupps' stock with actual knowledge of the misrepresenta-

tions. Actual knowledge, however, would preclude the Comeaus from recovering under the statute in any event. *Supra,* at 1157–1158. Because the Comeaus did not engage in the "same illegal conduct" alleged against the Rupps, the defense of *in pari delicto* fails even under the common law principles.

■ Moreover, allowing such a defense would not further the remedial purposes of the Kansas Securities Act. Kansas cases have rejected the defense of *in pari delicto* where the defendant has violated a statutory duty that is imposed for the protection of a class to which the plaintiff belongs, even if the plaintiff participated in the violation. *See Young v. Barker,* 185 Kan. 246, 256 & syl. ¶ 3, 342 P.2d 150 (1959) (parties to usurious transaction not *in pari delicto* since Consumer Loan Act was enacted to protect borrowers); *Stegman v. Offerle Coop. Grain & Supply Co.,* 151 Kan. 655, 100 P.2d 635 (1940) (purchaser who knows seed has not been tested and labeled not *in pari delicto* where statute requiring such is for protection of purchasers). Even assuming that the Comeaus were sophisticated buyers, (which the Comeaus dispute), the defense of *in pari delicto* does not defeat a claim merely because it is being asserted by a sophisticated buyer who may not need the protections of the securities laws. *Pinter,* 486 U.S. at 636, 108 S.Ct. at 2072. By granting even the sophisticated buyer a cause of action against a misrepresenting seller, the seller is encouraged to provide full disclosure, which in turn "serves to protect the unknowing and innocent investor." *Id.* at 637 n. 13, 108 S.Ct. at 2073 n. 13.

The court finds that genuine issues of material fact remain with respect to the Comeaus' claim under K.S.A. § 17–1268(a). Accordingly, the court will deny the Rupps' motion for summary judgment as to this claim.

#### b. *Common Law Claims*

The Comeaus seek relief under the common law theories of breach of fiduciary duties; breach of warranties made in the

stock sale agreement; and fraudulent inducement or misrepresentation.

 Reliance is an essential element to a Kansas breach of warranty claim. *Land v. Roper Corp.*, 531 F.2d 445, 448 (10th Cir.1976); *Owens–Corning Fiberglas Corp. v. Sonic Dev. Corp.*, 546 F.Supp. 533, 541 (D.Kan.1982); *Topeka Mill & Elevator Co. v. Triplett*, 168 Kan. 428, 436, 438, 213 P.2d 964 (1950); *see also Osborn v. Grego*, 226 Kan. 212, 217, 596 P.2d 1233 (1979) ("Damages are not recoverable for harm that a party should have foreseen and could have avoided by reasonable effort without undue risk, expense or humiliation."); Restatement (Second) of Contracts § 350 (1981). Similarly, a plaintiff seeking recovery on a claim of fraudulent misrepresentation must prove that the plaintiff's reliance was reasonable, justifiable and detrimental. *Wegerer v. First Commodity Corp. of Boston*, 744 F.2d 719, 723 (10th Cir.1984); *Whitten v. Farmland Indus., Inc.*, 759 F.Supp. 1522, 1542 (D.Kan.1991); *Hutchinson Travel Agency, Inc. v. McGregor*, 10 Kan.App.2d 461, 464, 701 P.2d 977, *review denied*, 238 Kan. 877 (1985). Although the element of justifiable reliance might not require the plaintiff to exercise due diligence to discover the falsity of the representations, *see Metal Trading Servs. v. Trans–World Servs.*, 781 F.Supp. 1539, 1545 (D.Kan.1991), justifiable reliance is absent where a plaintiff is charged as a matter of law with constructive knowledge of information that would alert a reasonable person to the falsity of the representation. *See Weigand v. Union Nat'l Bank of Wichita*, 227 Kan. 747, 756–57, 610 P.2d 572 (1980); *Metal Trading*, 781 F.Supp. at 1546 n. 1.

 For the reasons stated at *supra* 1148–1151, the court finds that the Comeaus cannot establish justifiable reliance on the Rupps or on the warranties allegedly contained in the stock sale agreement. The Comeaus' claim of breach of fiduciary duty must also fail for the reasons stated at *supra* 1151–1152. Summary judgment will be granted in favor of the Rupps on the Comeaus' state common law claims. The Rupps' motion (Doc. 907) to strike the Comeaus' fraud claim from the pretrial order is moot.

### E. FDIC v. Rupps

The Rupps move for summary judgment on the RCSA's claim of breach of fiduciary duty, asserted by the FDIC as its successor in interest.[16]

 The Rupps first make the oblique argument that the RCSA's action is a "shareholders' derivative claim," identical to the Comeaus' cause of action, and thus subject to the same defenses as against the Comeaus. The court finds otherwise. The claims of the FDIC are those possessed by the Association itself, and thus, by definition are not a "shareholders' derivative action." *See Black's Law Dictionary* at 399 (5th ed. 1979). Moreover, for the reasons previously stated, *supra* at 1140–1142, the conduct of RCSA's former officers and directors is not imputed to the FDIC. Accordingly, the defenses available against the Comeaus will not be incorporated wholesale into the Rupps' defenses against the FDIC.

 The Rupps argue that they acted " ' "without corrupt motive and in good faith," ' " *Harman v. Willbern*, 374 F.Supp. 1149, 1162 (D.Kan.1974), *aff'd*, 520 F.2d 1333 (10th Cir.1975), and that the "business judgment rule" precludes judicial interference with their good faith management of corporate affairs. *See Sampson v. Hunt*, 233 Kan. 572, 586, 665 P.2d 743 (1983) (no liability where board of directors made good faith effort). The court finds that the issue of the Rupps' good faith, non-negligent management of the RCSA's affairs is very much in dispute and entirely inappropriate for summary judgment disposition.

The motion will be denied.

### F. Accountants v. Rupps

The Rupps move for summary judgment on the Accountants' claims for indemnity

---

**16.** The Rupps have devoted only two pages of argument to their motion against the FDIC. The FDIC has responded in opposition with a memorandum of 81 pages.

against them.[17]

■ The Rupps first contend that the Accountants have no standing to assert their indemnity claims, arguing that only the RCSA has the right to assert claims against its directors for their negligent or fraudulent mismanagement of the corporation. *See Speer v. Dighton Grain, Inc.,* 229 Kan., 272, 284 & syl. ¶ 9, 624 P.2d 952 (1981); *supra* at 1152–1153. This argument is without merit. The Accountants do not seek independent recovery from the Rupps for a breach of the Rupps' duty to their former corporation. Rather, the Accountants claim that in the event they are found liable to RCSA, they would be entitled to indemnity from the Rupps for the Rupps' active or primary breach of their duty to the RCSA. In other words, the Accountants invoke a theory of derivative liability that the common law allows a passive or secondary tortfeasor to assert against an active or primary tortfeasor who breached a duty to the injured party. *See Comeau,* 762 F.Supp. at 1444 & 1446–47. Because Kansas law grants a derivative cause of action to indemnitees such as the Accountants, it follows that the Accountants have standing to prosecute this claim against the Rupps.

■ The Rupps also argue that the facts do not support the Accountants' indemnity claim. The court is unable to make such a determination in these summary judgment proceedings.

### G. *Accountants v. Comeaus* (Doc. 812)

■ Pursuant to Fed.R.Civ.P. 12(b)(6), the Comeaus move for dismissal of the Accountants' claims for indemnity against them. The Comeaus' motion is based on the court's previous ruling that the Accountants would have no liability, and thus no right to indemnity against any party, if the

Comeaus were found to be contributorily negligent. *See* 762 F.Supp. at 1440–41 & 1449. The premise for the court's previous ruling, however, no longer exists. Because the wrongful conduct of RCSA's former directors will not be imputed to the FDIC, and because the Accountants might be found liable to the FDIC for negligent conduct, the Accountants have an indemnity claim against the Comeaus for the Comeaus' active or primary negligence in causing the FDIC's injuries. Although the Comeaus correctly argue that the Accountants cannot be indemnified for their reckless or intentional wrongdoing, *see, e.g., Olson Farms, Inc. v. Safeway Stores, Inc.,* 649 F.2d 1370, 1378–79 (10th Cir.1979), the FDIC also asserts a negligence claim against the Accountants. Thus, the Accountants have stated an indemnity claim on the face of the pleadings that allows them to produce evidence on this matter. *Cf. Pyramid Condominium Ass'n v. Morgan,* 606 F.Supp. 592, 596 (D.Md.1985) (no claim for indemnity if third-party plaintiff's liability arises only upon proof of active negligence), *aff'd mem.,* 823 F.2d 548 (4th Cir.1987).

### H. *Accountants v. Bryan Ronck & Jack Curtis* (Doc. 816)

Third-party defendants Ronck and Curtis move for summary judgment on the Accountants' indemnity claims against them.

■ Ronck officially became the president, chief operating officer, and a director of RCSA on February 10, 1986, in which capacities he served until his resignation in September 1986. Curtis served as vice president and a director of RCSA from February 10, 1986 until he resigned on May 28, 1986. The extent to which either of these defendants was involved in the operations of RCSA before February 10, 1986 is

---

**17.** The court has dismissed the Comeaus' claims against the Accountants, and therefore, the issue of the Accountants' right to indemnity is implicated only to the extent that the Accountants are found liable for the RCSA's losses asserted by the FDIC. Although the court previously observed that the defense of contributory negligence eliminated the applicability of the Accountants' indemnity claim against the FDIC,

762 F.Supp. at 1440–41, this ruling was premised on the rule that imputed to the RCSA the conduct of its former directors. Because the court has now ruled that such conduct will not be imputed to the FDIC, the Accountants' indemnity claim against the Rupps remains viable. For this reason, the court assumes that the Accountants preserve their objection to dismissal of their indemnity claims.

in dispute. In any event, the Accountants seek indemnity from these defendants only for their actions taken after February 10 and only with respect to certain specific loans for which the FDIC claims damages. The Accountants contend that these actions, which involve the approval or extension of certain risky loans, constitute active negligence in causing the FDIC's claimed losses on these loans.

Ronck and Curtis argue that the facts do not warrant the conclusion that they were guilty of active or primary negligence. The court finds no merit in this argument. Although the Accountants may be found to have negligently performed their audits, genuine issues of material fact exist as to the reasonableness of any reliance that the officers and directors claim to have placed on these audits. Moreover, contrary to the suggestion of third-party defendants, the viability of the Accountants' indemnity claim does not turn on whether the Accountants "relied" on Ronck and Curtis. The only question is whether these officers and directors breached duties to RCSA, which breach was primary or active in causing the RCSA's losses on the loans. *See Comeau,* 762 F.Supp. at 1444 & 1446–47. Viewing the evidence most favorably to the Accountants, the jury could reasonably find that the Accountants only negligently performed their audits, and that the actions of Ronck and Curtis, including their failure to recognize the folly of relying on the audits, was reckless with respect to the specific loans.

For the reasons previously discussed, *supra* at 1140–1142, the court also rejects the argument that the wrongful conduct of Ronck and Curtis must be imputed to the FDIC.

## II. Motion for Order Approving Settlement (Doc. 567)

The FDIC has moved for an order approving a settlement between it and defendant Farmers National Bank ("Farmers"). Recently, Farmers has joined in the FDIC's motion. (Doc. 960). The motion is opposed by the Accountants.

At the times relevant to this lawsuit, Farmers was owned and controlled by the Rupps. In its Fourth Amended Complaint, the FDIC alleges that Farmers, through the Rupps, interfered with the fiduciary duties owed by the Rupps to RCSA, and that Farmers received the benefits of this breach. In essence, the FDIC claims that the Rupps caused RCSA to make bad loans, the proceeds of which were used to pay down bad loans on the books of Farmers.

The proposed settlement between the FDIC and Farmers requires that the FDIC seek judicial approval of the settlement. Settlement between the parties is contingent upon judicial approval of two provisions that are pertinent to this discussion: (1) that the settlement will result in a maximum aggregate setoff of no more than $25,000 (which is the amount Farmers agrees to pay FDIC) against any judgment that the FDIC may obtain against any nonsettling defendants found to be jointly liable with Farmers; and (2) that no nonsettling defendant will have any right to contribution or indemnity against Farmers.

At the request of the parties, the court deferred ruling on the motion for approval pending the appellate disposition of *FDIC v. Geldermann, Inc.,* 763 F.Supp. 524 (W.D.Okla.1990). In *Geldermann,* the FDIC sued several persons for their alleged role in causing losses to a savings and loan association. In separate and unrelated litigation, the FDIC also sued the association's former president and certain of its directors for their actions in different transactions. The FDIC reached a tentative settlement with these latter defendants ("the Settlors"), which settlement contained a term similar to that for which approval is sought in this case: the FDIC was required to obtain a court order in the *Geldermann* action that would bar the *Geldermann* defendants from seeking contribution or indemnity from the Settlors. The district court in *Geldermann* approved the settlement, entered an order barring its defendants from contribution or indemnity against the Settlors, and certified the order as a final appealable order.

On appeal, the court held that the FDIC was not the real party in interest for purposes of seeking approval of the settlement. *FDIC v. Geldermann, Inc.*, 975 F.2d 695, 697 (10th Cir.1992). The court noted that "[c]ontribution bar orders are frequently upheld when they are sought *by a settling defendant* against a nonsettling defendant in the same case." *Id.* (emphasis added). In that case, however, the FDIC—the plaintiff against both sets of defendants in separate cases—was seeking the bar order. The court was also troubled by the fact that the bar order "preclude[d] a nonsettling defendant from maintaining a claim of contribution or indemnity against *nonparties*." *Id.* at 698 (emphasis in original). The court concluded: "Any claims for contribution or indemnity that may be asserted by the defendants in the [*Geldermann* action] against the Settlors must be adjudicated through them—not through the FDIC." *Id.*

The *Geldermann* decision also expresses concerns unrelated to the real party in interest status of the FDIC. The court noted that the bar order purported to determine the maximum amount of setoff that would be available at some point in time to parties found to be jointly liable with the Settlors. This provision, stated the court,

> is speculative because no judgment has yet been awarded against the [*Geldermann* defendants], and so the basis for, and the amount of, any such judgment is not yet known. Whether the Settlors are joint tortfeasors with the [*Geldermann*] Defendants is as yet totally unknown. Whether other suits may be brought against other joint tortfeasors is also unknown.

*Id.* at 699. Thus, in part "because of the speculative and premature nature of the remainder of the order dealing with setoff," the court vacated the bar order and remanded. *Id.* at 699.

For purposes of this motion, the court assumes that the real party in interest concerns of *Geldermann* are removed from this case—where the settling defendant seeks the bar order, (Doc. 960), and both the settling and nonsettling defendants are parties to the same litigation. The *Geldermann* decision, however, suggests a problem of constitutional dimension that the court must address *sua sponte*.

Neither the Accountants nor any other defendant has made any claim for indemnity or contribution against Farmers. Yet, as in *Geldermann*, the FDIC and Farmers invite this court to assume that such claims might be made in the future—presumably (since the pretrial order contains no such claims) in another lawsuit. The court also notes that because comparative fault principles are inapplicable to this action, 762 F.Supp. at 1438, there is no possibility that the FDIC's recovery against nonsettling defendants could be setoff by the amount of comparative fault attributable to a settling "phantom defendant." *See, e.g., McGraw v. Sanders Co. Plumbing & Heating*, 233 Kan. 766, 667 P.2d 289, syl. ¶ 7 (1983).

Article III of the United States Constitution limits the jurisdiction of federal courts to actual, live cases or controversies that are in existence at the time the judicial determination is sought. *E.g., Burke v. Barnes*, 479 U.S. 361, 363, 107 S.Ct. 734, 736, 93 L.Ed.2d 732 (1987). "[T]he mere 'speculative contingenc[y]' that [defendants] will assert new federal claims for ... relief" in future proceedings "cannot be said to be 'sufficiently real and immediate to show an existing controversy.'" *Deakins v. Monaghan*, 484 U.S. 193, 200 n. 4, 108 S.Ct. 523, 529 n. 4, 98 L.Ed.2d 529 (1988) (citations omitted).

The FDIC and Farmers ask this court to limit the liability of Farmers in suits unfiled, and to limit a "setoff" from the FDIC's recovery that cannot arise under the tort principles applicable to this suit. Toward the end of declaring these hypothetical rights, the settling parties move the court to express its views on the "very difficult legal questions," *Geldermann*, at 699, presented in determining whether "a special pro tanto rule should be established for the FDIC...." *Id.* Although the FDIC and Farmers desire such a determination for the laudable purpose of effecting a settlement, the court must decline the

invitation to issue the requested judicial declaration. The absence of an actual, live controversy implicating the restriction of rights that are not being asserted in either this action or any other action deprives the court of any power to address these issues. "The federal courts cannot issue advisory opinions...." *CSG Exploration Co. v. Federal Energy Regulatory Comm'n*, 930 F.2d 1477, 1482 (10th Cir.1991). *Accord Sierra Club v. Yeutter*, 911 F.2d 1405, 1420 (10th Cir.1990). The motion must be denied for lack of subject matter jurisdiction.

III. Accountants' Motion to Dismiss FDIC's Complaint and Other Sanctions (Doc. 598)

■ Pursuant to Fed.R.Civ.P. 37(b)(2)(C), the Accountants move for dismissal of all claims by the FDIC for its failure to produce documents compelled by order of the magistrate.

The documents sought by the Accountants relate to a report generated by the United States General Accounting Office ("GAO report"). This report, dated January 13, 1989, sets forth projections made by the FHLBB and the FSLIC as to the amount that it would cost "to resolve the problems" at each of 222 troubled and insolvent savings and loan associations. The RCSA is listed among such associations at a projected cost of $2,798,000 as of December 31, 1987. The Accountants sought documents pertaining to this figure, including the basis for the figure and how it was arrived at. In the Accountants' view, such information is "potentially devastating" to the FDIC's case, because the figure of $2,798,000 represents *all* losses at the institution, and not merely the Halle loan losses for which the FDIC seeks recovery. Thus, the Accountants reason that the requested documents may show that the actual losses

on the post-August 2, 1984 Halle loans are significantly less than the $2,798,000 reported to the GAO (and certainly less than the $13 million amount claimed by the FDIC in this action).[18]

Over the relevancy objections of the FDIC, the magistrate compelled production of requested documents. Although some documents have been forthcoming, the FDIC contends that its reasonable, good faith efforts have not yielded any further documents responsive to the motion and order to produce.

Dismissal is a drastic sanction that is reserved only for the most egregious of discovery abuses. *Ocelot Oil Corp. v. Sparrow Indus.*, 847 F.2d 1458, 1464–65 (10th Cir.1988); *FDIC v. Renda*, 126 F.R.D. 70, 72 (D.Kan.1989). "Because dismissal is a harsh sanction involving considerations of due process, the trial court should dismiss a claim as a discovery sanction 'only when a party has willfully or in bad faith disobeyed a discovery order.'" *Gocolay v. New Mexico Fed. Savings & Loan Ass'n*, 968 F.2d 1017, 1020 (10th Cir.1992) (citation omitted). Generally, the court determines the propriety of dismissal as a sanction by considering: "(1) the degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; and (3) the culpability of the litigant." *Meade v. Grubbs*, 841 F.2d 1512, 1521 n. 7 (10th Cir.1988) (citations omitted).

The Accountants find it suspicious that the FDIC would vigorously oppose production on the grounds of relevancy in response to the motion to compel, only to claim an inability to locate the documents after the magistrate ordered their production. The court does not so lightly share in suspicions suggesting that officers of the court have disregarded court orders with which they are dissatisfied.[19] In the

**18.** The Accountants also sought to obtain the documents by serving a subpoena duces tecum upon the Custodian of Records of the General Accounting Office in Washington, D.C. Upon motion filed by the Chairman of the Committee on Banking, Finance and Urban Affairs of the House of Representatives, the United States District Court for the District of Columbia quashed

this subpoena on the basis of the privilege afforded by .the Speech and Debate Clause.

**19.** This is not the first plaintiff in this action whom the Accountants have accused of withholding information ordered produced by the court, nor the first time that the Accountants have failed to substantiate their claim with any-

court's view, it is equally plausible that the FDIC's failure to produce is attributable at least in part to the Kafkaesque maize that is endemic to governmental bureaucracy and that retards even inter-governmental requests for information. The FDIC has submitted affidavits documenting its extensive search for responsive materials among the various agencies that have assumed the functions of the former FSLIC and FHLBB. Anticipating the difficulties of locating the documents when they were first requested, the FDIC might reasonably have concluded that a good-faith legal argument opposing their production was the path of least resistance.

■■■■■ Nonetheless, the court is sympathetic to the frustration of the Accountants. Although the FDIC is part of a complex regulatory banking scheme that involves other agencies, the FDIC, as an arm of the government, is in a superior position to gain access to the documents of these other agencies. Because of this superior position, the court will not accept a naked averment by the FDIC that a particular document is not within its "possession." The FDIC must produce responsive documents that are in its "possession, custody or *control,*" Fed.R.Civ.P. 34(a) (emphasis added), and "control" comprehends not only possession but also the right, authority, or ability to obtain the documents. *E.g., Gerling Int'l Ins. Co. v. Commissioner,* 839 F.2d 131, 140 (3d Cir.1988); *Scott v. Arex, Inc.,* 124 F.R.D. 39, 41 (D.Conn.1989); 8 C. Wright & A. Miller, *Federal Practice and Procedure* § 2210, at 621 (1970); *cf. In re Sunrise Sec. Litig.,* 109 B.R. 658, 661 (E.D.Pa.1990) (denial of discovery from FSLIC of documents that were "exclusive property" of FHLBB). Thus, the court finds that compliance with the magistrate's order requires the FDIC to make reasonable, diligent inquires, and, if applicable, demands of other agencies in order to obtain documents within the possession of such other agencies. *See* 12 U.S.C. § 1821(*o* ) (federal banking agencies must make available to FDIC–Receiver all supervisory records of insured institution).

■■■■ The court finds, however, that the FDIC has complied with the magistrate's order. The FDIC has submitted affidavits documenting its requests for documents from other agencies who have assumed the functions of the FSLIC and the FHLBB upon their abolishment under FIRREA. *See* Pub.L. No. 101–73, §§ 401(a)(1) & (2), 103 Stat. 183 (1989).[20] Based upon its sworn evidentiary support, the court finds no evidence of a willful failure to comply with the magistrate's order. *Cf. Norman v. Young,* 422 F.2d 470, 473 (10th Cir.1970) (absent sworn denial, records normally kept in business of party are presumed to exist).

■■■■ Nor does the court find any real prejudice to the Accountants resulting from the inability of the FDIC to locate further responsive documents. The FDIC claims damages of $13 million against the Accountants for losses incurred on specific loans. As of December 31, 1987, however, the GAO report projected that the "problems" at RCSA could be remedied at a cost of $2,798,000. Thus, the report itself already suggests that the amount of losses on the Halle loans are significantly less than claimed.[21] The Accountants seek the information from which the GAO report was generated only to show that the FDIC's damages are *even less* than $2,798,-000. The requested documents, although potentially relevant, are not so critical to the Accountants' case as to warrant the draconian sanction of dismissal.

The court also declines to impose lesser sanctions than dismissal. *See Mason v. E.L. Murphy Trucking Co.,* 769 F.Supp.

---

thing more than speculation. *See Comeau,* 142 F.R.D. 683, 687 (D.Kan.1992).

**20.** The functions of these former agencies have been assumed by the Office of Thrift Supervision, 12 U.S.C. § 1462a(a), the Resolution Trust Corporation, *id.* § 1441a(b)(1), and the Federal Deposit Insurance Corporation, *id.* § 1821.

**21.** The FDIC disputes the accuracy of the GAO report, contending that it was only a gross approximation that had not even begun to take into account the quality of RCSA's assets.

341, 345 (D.Kan.1991) ("Normally, no adverse effect to one's opponent flows from the loss of evidence unless the opponent is shown to have had bad faith."). The court, however, reminds the FDIC of its continuing duty to disclose responsive documents that may be discovered. *See* Fed.R.Civ.P. 26(e).

## IV. Objections to Magistrate's Order (Doc. 896)

The Accountants object to the Magistrate's order of June 8, 1992. In that order, the magistrate found that the FDIC had complied with an earlier order of January 6, 1992. (Doc. 800). In the January 6 order, the magistrate ordered the FDIC either to produce responsive documents or to produce affidavits detailing the steps taken to locate documents that it was unable to find. The magistrate specifically ordered the FDIC to inquire of other federal agencies to determine which agency would have the requested documents. The FDIC conducted the search, enlisting the aid of the Office of Thrift Supervision ("OTS"), and submitted affidavits.[22] The magistrate found that the affidavits demonstrated the good faith efforts of both the FDIC and the OTS to locate the documents. The magistrate therefore denied the Accountants' motion to compel production of documents that the FDIC was unable to locate.

■■■ The court reviews a magistrate's order under the terms of 28 U.S.C. § 636 and Fed.R.Civ.P. 72(a). As to nondispositive pretrial matters, the district court reviews the magistrate's order under a "clearly erroneous or contrary to law" standard of review. *Ocelot Oil Corp. v. Sparrow Industries*, 847 F.2d 1458, 1461–62 (10th Cir.1988). Under this standard, the court must affirm the decision of the magistrate "unless it 'on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Id.* at 1464 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). Because a magistrate is afforded

broad discretion in the resolution of nondispositive discovery disputes, the court will overrule the magistrate's determination only if this discretion is abused. *Comeau v. Rupp*, 762 F.Supp. 1434, 1450 (D.Kan.1991); *Detection Systems, Inc. v. Pittway Corp.*, 96 F.R.D. 152, 154 (W.D.N.Y.1982). *See also Sil–Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1514 (10th Cir. 1990).

■■■ The court finds no clear error in the magistrate's order. Here again, the Accountants ask the court to speculate that the FDIC has intentionally withheld or destroyed information ordered produced by the court. The court declines to engage in such speculation. Nor does the court find any error in the magistrate's conclusion that the FDIC has conducted a diligent search for the documents, both among its own records and among those of the OTS.

Accordingly, the objections to the Magistrate's order of June 8, 1992 will be overruled.

## V. Motion to Bifurcate (Doc. 904)

The final matter before the court is the Comeaus' motion to bifurcate the trial of this case.

■■■ Under Fed.R.Civ.P. 42(b), the court may order separate trials of any claim "in the furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy,...." Separate trials of claims properly joined is not the usual course. *Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307, 1323–24 (5th Cir.1976). Whether to order separate trials is committed to the sound discretion of the trial court. *Eastridge Dev. Co. v. Halpert Assocs.*, 853 F.2d 772, 781 (10th Cir.1988).

The Comeaus desire a separate trial on their claim because proof of their case will ostensibly require far less time than that of the FDIC. The Comeaus also contend that the facts and issues as to their claim are distinct from those of the FDIC.

---

**22.** No party has provided the court with copies of the affidavits.

The court finds that a joint trial of all issues is in the interest of all parties because it will streamline the issues and reduce jury confusion. Indeed, separate trials would not even serve to further the Comeaus' interest in reducing their amount time spent in trial. Because the court has dismissed the Comeaus' claims against the Accountants, the Accountants would not be present at the Comeaus' trial of their remaining claim against the Rupps. Presumably, however, the Comeaus intend to present a defense to the Accountants' claim for indemnity against them for any amount that the Accountants are found liable to the FDIC. Thus, the Comeaus would be attending the FDIC's trial in any event. The court finds no reason to bifurcate trial of this case.

## VI. Conclusion

Accordingly, the court denies the motion (Doc. 821) of Grant Thornton and Fox & Company for summary judgment against the FDIC.

The court grants the motion (Doc. 817) of Grant Thornton and Fox & Company for summary judgment against the Comeaus and Rupp Financial Corporation as to all claims alleged by plaintiff Comeaus and Rupp Financial Corporation.

The court grants the motion (Doc. 814) of A.J. Schwartz for summary judgment against Grant Thornton and Fox & Company.

The court grants in part and denies in part the motion (Doc. 802) of Terry and C.F. Rupp for summary judgment. The court grants the Rupps' motion for summary judgment against the Comeaus on all claims except the Comeaus' claim alleged under K.S.A. § 17–1268(a), as to which the motion is denied. The court denies the Rupps' motion for summary judgment against the FDIC and against Grant Thornton and Fox & Company.

The Rupps' motion (Doc. 907) to strike the Comeaus' fraud claim from the pretrial order is moot.

The court denies the motion (Doc. 812) of the Comeaus for dismissal of the indemnity counterclaims alleged by Grant Thornton and Fox & Company.

The court denies the motion (Doc. 816) of Bryan Ronck & Jack Curtis for summary judgment.

The court denies the motion (Doc. 567) of the FDIC and Farmers National Bank (Doc. 960) for an order approving settlement.

The court denies the motion (Doc. 598) of Grant Thornton and Fox & Company to dismiss the FDIC's complaint and other sanctions.

The court overrules the objections (Doc. 896) of Grant Thornton and Fox & Company to the Magistrate's Order of June 8, 1992.

The court denies the motion (Doc. 904) of the Comeaus to bifurcate.

Any motions for reconsideration and supporting memoranda shall comply strictly with the time requirements of D.Kan.Rule 206(f) and shall not exceed 25 pages in length. Any responses in opposition and supporting memoranda shall comply strictly with the time requirements of D.Kan. Rule 206(b) and shall not exceed 15 pages in length. In the interest of true and judicial economy, reply memoranda to any response are strongly discouraged and shall not be filed without prior leave of the court for good cause shown.

Trial of the case shall commence on January 5, 1993.

IT IS SO ORDERED.

# APPENDIX

OMB NO. 3064-001
EXPIRES 11/30-5

| FEDERAL HOME LOAN BANK BOARD | DISTRICT/DOCKET | NAME AND ADDRESS OF INSTITUTION (Please Use Preprinted Label) |
|---|---|---|
| **MONTHLY FINANCIAL REPORT** | | THE ROOKS COUNTY SA 10/05670 |
| Month Ending: 8-31 , 19 85 | | 200 S JEFFERSON<br>PLAINVILLE KS<br>67663-0000 |

| REPORT IN THOUSANDS OF DOLLARS | PREPARED BY: Mimi Kruse | PHONE NUMBER (Include Area Code): 913-434-2045 |
|---|---|---|

## SELECTED BALANCE SHEET ITEMS AT END OF MONTH

| | | BIL | MIL | THOU |
|---|---|---|---|---|
| Total Mortgage Loans and Contracts | 010 | | 36 | 301 |
| Deposits: | | | | |
| With Balances $100,000 or Less | 020 | | 28 | 668 |
| With Balances Greater Than $100,000 | 030 | | 12 | 921 |
| FHLBank Advances | 040 | | 2 | 000 |
| Other Borrowed Money | 050 | | | 0 |
| Other Liabilities | 060 | | | 796 |
| Total Regulatory Net Worth | 070 | | 2 | 617 |

### MEMO

| | | BIL | MIL | THOU |
|---|---|---|---|---|
| Total Broker-Originated Deposits Included on Lines 020 and 030 | 080 | | | 300 |
| Loans 60 or More Days Delinquent, Foreclosed Real Estate and Real Estate in Judgment (Net) and Other Repossessed Assets (Net) | 090 | | | 985 |
| Qualifying Subordinated Debentures Included in Total Regulatory Net Worth (Line 070) | 100 | | | 0 |

## ACTIVITY DURING THE MONTH

| | | BIL | MIL | THOU |
|---|---|---|---|---|
| Mortgage Loans Closed: | | | | |
| Construction Loans | 200 | | | 0 |
| Permanent Loans for: | | | | |
| Land | 210 | | | 0 |
| All Other | 220 | | | 27 |
| Nonmortgage Loans Closed or Purchased: | | | | |
| Commercial | 230 | | | 180 |
| Consumer | 240 | | | 12 |
| Mortgage Loans and Participations Purchased | 250 | | 1 | 744 |
| Mortgage Loans and Participations Sold* | 260 | | | 0 |
| Gross Operating Income for This Month | 270 | | | 420 |
| Net Operating Income for This Month | 280 | | | 25 |
| Net Income for This Month | 290 | | | 25 |
| Interest Charges for This Month | 300 | | | 349 |

*Exclude sales to FHLMC, FNMA and similar governmental-type agencies and to pools (trusts) for use as the basis for issuing mortgage-backed pass-through securities.

### COMMITMENTS OUTSTANDING AT END OF MONTH

| | | BIL | MIL | THOU |
|---|---|---|---|---|
| Commitments Outstanding: | | | | |
| To Originate Loans | 310 | | | 0 |
| To Purchase Loans | 320 | | 1 | 600 |

## QUESTIONS CONCERNING ACTIVITY DURING THE MONTH

DURING THIS MONTH: Y = Yes N = No

1. Has there been:
 a. a change in control of the institution? [400] N
 b. a change in the chief executive officer? [410] N
 c. any change in the composition of the board of directors? [420] N
2. Has the institution formed or acquired an interest in:
 a. a service corporation? [430] N
 b. a joint venture? [440] N
 c. a finance subsidiary? [450] N
 d. any other subsidiary? [460] N
3. Were brokers used to acquire loans? [470] N
4. Did the institution engage in risk management activities involving:
 a. futures? [480] N
 b. options? [490] N
 c. reverse repo's, including dollar rolls? [500] N
 d. interest rate swaps? [510] N
 e. other hedging activities? [520] N
5. Were any loans made to or investments made in any holding company, subsidiary, joint venture or other affiliate of the institution? [530] N
6. Was the institution the "lead" lender in any transaction consummated this month? [540] N
7. Was (a) any single loan or commitment made or (b) any total of loans or commitments made to one borrower that exceeded either $1 million or two percent of the institution's assets at the end of the preceding month? [550] N
8. Were any assets, etc., acquired as a result of merger, or was any branch purchased or sold? [560] N

Mail the original and one copy of this report to the Federal Home Loan Bank in your District. For a new supply of this form, contact the ICA Coordinator at your District Bank.

HLBB Form No. 1337
January 1985 REPORT DUE BY 10TH OF MONTH ☆ U.S. Government Printing Office 1985—477-678

C042290

**1170**

DEFENDANT'S
EXHIBIT
A-50

OMB NO. 3068-0011
(Expires 11/30/)

| FEDERAL HOME LOAN BANK BOARD | DISTRICT/DOCKET | NAME AND ADDRESS OF INSTITUTION (Please Use Preprinted Label) |
|---|---|---|
| MONTHLY FINANCIAL REPORT | | 10/05670 |
| Month Ending: __10/31__, 19 85 | | THE ROOKS COUNTY SA 200 S JEFFERSON PLAINVILLE KS # 67663-0000 |

| REPORT IN THOUSANDS OF DOLLARS | PREPARED BY, | PHONE NUMBER (Include Area Code) |
|---|---|---|

| SELECTED BALANCE SHEET ITEMS AT END OF MONTH | | | | | ACTIVITY DURING THE MONTH | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | BIL | MIL | THOU | | | BIL | MIL | THOU |
| Total Mortgage Loans and Contracts | 010 | | 36 | 126 | Mortgage Loans Closed: Construction Loans | 200 | | | 0 |
| Deposits: | | | | | Permanent Loans for: | | | | |
| With Balances $100,000 or Less | 020 | | 29 | 560 | Land | 210 | | | 0 |
| With Balances Greater Than $100,000 | 030 | | 12 | 567 | All Other | 220 | | | 106 |
| | | | | | Nonmortgage Loans | | | | |
| HLBank Advances | 040 | | 2 | 000 | Closed or Purchased: | | | | |
| Other Borrowed Money | 050 | | | 0 | Commercial | 230 | | | 79 |
| Other Liabilities | 060 | | | 642 | Consumer | 240 | | | 10 |
| | | | | | Mortgage Loans and | | | | |
| Total Regulatory Net Worth | 070 | | 2 | 166 | Participations Purchased | 250 | | | 868 |
| | | | | | Mortgage Loans and Participations Sold* | 260 | | | 0 |
| **MEMO** | | | | | Gross Operating Income for This Month | 270 | | | 521 |
| Total Broker-Originated Deposits Included on Lines 020 and 030 | 080 | | | 516 | Net Operating Income for This Month | 280 | | | 104 |
| | | | | | Net Income for This Month | 290 | | | 104 |
| Loans 60 or More Days Delinquent, Foreclosed Real Estate and | | | | | Interest Charges for This Month | 300 | | | 346 |
| Real Estate in Judgment (Net) and Other Repossessed Assets (Net) | 090 | | 3 | 298 | *Exclude sales to FHLMC, FNMA and similar governmental-type agencies and to pools (trusts) for use as the basis for issuing mortgage-backed pass-through securities. | | | | |
| Qualifying Subordinated Debentures Included in Total Regulatory Net Worth (Line 070) | 100 | | | 0 | **COMMITMENTS OUTSTANDING AT END OF MONTH** | | | | |
| | | | | | Commitments Outstanding: To Originate Loans | 310 | | | 0 |
| | | | | | To Purchase Loans | 320 | | 1 | 800 |

**QUESTIONS CONCERNING ACTIVITY DURING THE MONTH**

DURING THIS MONTH:

Y = Yes
N = No

1. Has there been:
 a. a change in control of the institution? — 400 N
 b. a change in the chief executive officer? — 410 N
 c. any change in the composition of the board of directors? — 420 N
2. Has the institution formed or acquired an interest in:
 a. a service corporation? — 430 N
 b. a joint venture? — 440 N
 c. a finance subsidiary? — 450 N
 d. any other subsidiary? — 460 N
3. Were brokers used to acquire loans? — 470 N
4. Did the institution engage in risk management activities involving:
 a. futures? — 480 N
 b. options? — 490 N
 c. reverse repo's, including dollar rolls? — 500 N
 d. interest rate swaps? — 510 N
 e. other hedging activities? — 520 N
5. Were any loans made to or investments made in any holding company, subsidiary, joint venture or other affiliate of the institution? — 530 N
6. Was the institution the "lead" lender in any transaction consummated this month? — 540 N
7. Was (a) any single loan or commitment made or (b) any total of loans or commitments made to one borrower that exceeded either $1 million or two percent of the institution's assets at the end of the preceding month? — 550 N
8. Were any assets, etc., acquired as a result of merger, or was any branch purchased or sold? — 560 N

Mail the original and one copy of this report to the Federal Home Loan Bank in your District. For a new supply of this form, contact the ICA Coordinator at your District Bank.

067690

FHLB Form No. 1227
January 1985

REPORT DUE BY 10TH OF MONTH

U.S. Government Printing Office 1985-471-471

C000znn

DEFENDANT'S
EXHIBIT
A-51

| FEDERAL HOME LOAN BANK BOARD | DISTRICT/DOCKIT | NAME AND ADDRESS OF INSTITUTION (Please Use Preprinted Label) 10/05670 |
|---|---|---|
| MONTHLY FINANCIAL REPORT | | THE RCOKS COUNTY SA BOX A PLAINVILLE KS |
| Month Ending: 12-31 , 19 85 | | 67663-0000 |

| REPORT IN THOUSANDS OF DOLLARS | PREPARED BY: Mimi Kruse by BR | REPORT NUMBER (Include Area Code) 913-434-2045 |
|---|---|---|

## SELECTED BALANCE SHEET ITEMS AT END OF MONTH

| | | BIL | MIL | THOU |
|---|---|---|---|---|
| Total Mortgage Loans and Contracts | 010 | | 38 | 423 |
| Deposits: | | | | |
| With Balances $100,000 or Less | 020 | | 30 | 545 |
| With Balances Greater Than $100,000 | 030 | | 13 | 707 |
| PHLSank Advances | 040 | | 2 | 500 |
| Other Borrowed Money | 050 | | | -0- |
| Other Liabilities | 060 | | | 521 |
| Total Regulatory Net Worth | 070 | | 2 | 261 |

### MEMO

| | | BIL | MIL | THOU |
|---|---|---|---|---|
| Total Broker-Originated Deposits Included on Lines 020 and 030 | 080 | | | 490 |
| Loans 60 or More Days Delinquent, Foreclosed Real Estate and Real Estate in Judgment (Net) and Other Repossessed Assets (Net) | 090 | | 3 | 611 |
| Qualifying Subordinated Debentures Included in Total Regulatory Net Worth (Line 070) | 100 | | | -0- |

## ACTIVITY DURING THE MONTH

| | | BIL | MIL | THOU |
|---|---|---|---|---|
| Mortgage Loans Closed: | | | | |
| Construction Loans | 200 | | | -0- |
| Permanent Loans for: | | | | |
| Land | 210 | | | -0- |
| All Other | 220 | | | 168 |
| Nonmortgage Loans Closed or Purchased: | | | | |
| Commercial | 230 | | | -0- |
| Consumer | 240 | | | -0- |
| Mortgage Loans and Participations Purchased | 250 | | | 185 |
| Mortgage Loans and Participations Sold* | 260 | | | -0- |
| Gross Operating Income for This Month | 270 | | | 469 |
| Net Operating Income for This Month | 280 | | | 14 |
| Net Income for This Month | 290 | | | 14 |
| Interest Charges for The Month | 300 | | | 364 |

*Exclude sales to FHLMC, FNMA and similar governmental-type agencies and to pools (trusts) for use as the basis for issuing mortgage-backed pass-through securities

### COMMITMENTS OUTSTANDING AT END OF MONTH

| | | BIL | MIL | THOU |
|---|---|---|---|---|
| Commitments Outstanding: | | | | |
| To Originate Loans | 310 | | | -0- |
| To Purchase Loans (9 loans) | 320 | | 2 | 692 |

## QUESTIONS CONCERNING ACTIVITY DURING THE MONTH

DURING THIS MONTH:

Y = Yes
N = No

1. Has there been:
 a. a change in control of the institution? ... 400 N
 b. a change in the chief executive officer? ... 410 N
 c. any change in the composition of the board of directors? ... 420 N
2. Has the institution formed or acquired an interest in:
 a. a service corporation? ... 430 N
 b. a joint venture? ... 440 N
 c. a finance subsidiary? ... 450 N
 d. any other subsidiary? ... 460 N
3. Were brokers used to acquire loans? ... 470 N
4. Did the institution engage in risk management activities involving:
 a. futures? ... 480 N
 b. options? ... 490 N
 c. reverse repo's, including dollar rolls? ... 500 N
 d. interest rate swaps? ... 510 N
 e. other hedging activities? ... 520 N
5. Were any loans made to or investments made in any holding company, subsidiary, joint venture or other affiliate of the institution? ... 530 N
6. Was the institution the "lead" lender in any transaction consummated this month? ... 540 N
7. Was (a) any single loan or commitment made or (b) any total of loans or commitments made to one borrower that exceeded either $1 million or two percent of the institution's assets at the end of the preceding month? ... 550 N
8. Were any assets, etc., acquired as a result of merger, or was any branch purchased or sold? ... 560 N

Mail the original and one copy of this report to the Federal Home Loan Bank in your District. For a new supply of this form, contact the ICA Coordinator at your District Bank.

067692